**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ADORTHUS CHERRY,** | **1:18-cv-01268-LJO-EPG** |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER RE DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS (ECF No. 8)** |
| **v.** | |
| **Modesto Police Sergeant JAMES "DERRICK" TYLER, Lieutenant TERRY SEESE, the CITY OF MODESTO, and JOHN/JANE DOEs #s 1 through 10, inclusive,** | |
| **Defendants.** | |

## I. <u>PRELIMINARY STATEMENT TO PARTIES AND COUNSEL</u>

Judges in the Eastern District of California carry the heaviest caseloads in the nation, and this Court is unable to devote inordinate time and resources to individual cases and matters. Given the shortage of district judges and staff, this Court addresses only the arguments, evidence, and matters necessary to reach the decision in this order. The parties and counsel are encouraged to contact the offices of United States Senators Feinstein and Harris to address this Court's inability to accommodate the parties and this action. The parties are required to reconsider consent to conduct all further proceedings before a Magistrate Judge, whose schedules are far more realistic and accommodating to parties than that of U.S. Chief District Judge Lawrence J. O'Neill, who must prioritize criminal and older civil cases.

Civil trials set before Chief Judge O'Neill trail until he becomes available and are subject to suspension mid-trial to accommodate criminal matters. Civil trials are no longer reset to a later date if

Chief Judge O'Neill is unavailable on the original date set for trial. Moreover, this Court's Fresno Division randomly and without advance notice reassigns civil actions to U.S. District Judges throughout the Nation to serve as visiting judges. In the absence of Magistrate Judge consent, this action is subject to reassignment to a U.S. District Judge from inside or outside the Eastern District of California.

## II. INTRODUCTION

Plaintiff Adorthus Cherry brings this action against Defendants Sergeant James "Derrick" Tyler, Lieutenant Terry Seese, the City of Modesto, and Does 1-10. This action arises out of Plaintiff's arrest for allegedly threatening Sgt. Tyler at a high school football game. Plaintiff alleges causes of action for violation of his constitutional rights pursuant to 18 U.S.C. §§ 1983 and 1985, federal common law, and state law. Defendants move to dismiss all of Plaintiff's claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed below, the Court **GRANTS IN PART and DENIES IN PART** Defendants' motion to dismiss.

## III. BACKGROUND

**A.    Factual Allegations**

**1.    Plaintiff's Initial Contacts with Modesto Police**

Plaintiff Adorthus Cherry is a former resident of Modesto and former professional body builder. ECF No. 1 ¶ 13. Defendant Sergeant Derrick Taylor is a veteran of the Modesto Police Force. *Id.* ¶ 14. He was also, at the time of these events, the freshman running back coach for Modesto Central Catholic High School football team. *Id.* Sgt. Tyler and Plaintiff were acquainted, including because Sgt. Tyler once attempted to recruit Plaintiff's eldest son, who was a star at Oakdale High School, to play for Central Catholic. *Id.*

Plaintiff alleges that on or about June 9, 2016, several Modesto police officers confronted and detained Plaintiff on the street in front of a Modesto Police Department-owned building. *Id.* ¶ 15. Plaintiff pleads he filmed his encounter with police, within his rights, upon which police unlawfully detained him, falsely accusing him of causing a disturbance. *Id.* While the questioning officers began to

leave the scene, Sgt. Tyler allegedly emerged from the building and questioned Plaintiff.  *Id.* ¶ 16.

Plaintiff pleads the officers who had departed returned and informed Plaintiff that since he was on informal probation at the time for misdemeanor marijuana possession, he must submit to an immediate search.  *Id.* ¶ 17.  While the officers detained Plaintiff outside the police building, they ordered a probation search of his home.  *Id.*  During the probation search, police discovered a small indoor marijuana grow.  *Id.*  Modesto Police then arrested Plaintiff and charged him with cultivation and possession for sale of marijuana.  *Id.*  However, these charges were dismissed after Plaintiff allegedly presented evidence that he and his wife were authorized as medical marijuana patients to possess and cultivate all the marijuana that was seized from their home.  *Id.*

Also on or about June 9, 2016, the Modesto Police Department allegedly posted and/or distributed the first of at least three "Criminal Information Bulletins" regarding Plaintiff.  *Id.* ¶ 19.  The bulletins stated, in pertinent part:

> Cherry often videos officers with his telephone and /or from cameras outside his home. During his contacts with officers he attempts to bait officers with his demeanor into unwarranted uses of force or inappropriate arrests. He often posts videos or photographs of interactions with officers on the internet. Mr. Cherry is the subject of several restraining orders and appears to enjoy controversy and conflict with others including his family. His statements generally have not met the elements of terrorists threats, though his demeanor can be threatening. The Cherry's have several civil cases in litigation as well.

*Id.*

Approximately one month later, Plaintiff posted the following criticism of Sgt. Tyler on Plaintiff's Facebook page:  "CC [Central Catholic High school] employees a racist BLACK POLICE OFICER as a coach! Horrible!!!! See you in 10 wks!"  *Id.* ¶ 20.  Sgt. Taylor later testified that he interpreted "10 wks" to refer to the approaching rival varsity football game in Oakdale between Oakdale High School and Modesto Central Catholic High School.  *Id.* ¶ 21.  Sgt. Tyler testified later that he considered it threatening.  *Id.*  According to Tyler, he allegedly documented the post to his patrol captain, but there is no evidence he took any other action.  *Id.*

## 2. The Confrontation Between Sgt. Tyler and Plaintiff at a Football Game

On November 4, 2016, Plaintiff and Sgt. Tyler both attended the rival football game referenced in Plaintiff's Facebook post—Plaintiff to watch his son play and Sgt. Tyler as the coach for the freshman running backs. *Id.* ¶ 22. (Sgt. Tyler was not coaching this varsity game but only attending as a guest.) Sgt. Tyler allegedly was off duty and in civilian clothes. *Id.* The game took place at Oakdale High School. *Id.* ¶ 4.

Around the end of halftime, as Sgt. Tyler was returning from the restroom and walking back toward the football field, he saw Plaintiff walking in the opposite direction along with three or four other people. *Id.* ¶ 23. Plaintiff alleges that Sgt. Tyler initiated a conversation, saying "What's up" to Plaintiff. *Id.* Plaintiff pleads that the men then had a verbal exchange in which Plaintiff accused Sgt. Tyler of setting him up in the June 9, 2016 bust, which Sgt. Tyler denied. *Id.* A coach passing by asked if there was a problem, to which Sgt. Tyler answered no, and stated that he had arrested Plaintiff once before and could do so anytime he wanted. *Id.* Plaintiff alleges that at no point did he verbally or physically threaten Sgt. Tyler. *Id.* ¶ 24. Nevertheless, Sgt. Tyler later testified that he did not take anything Plaintiff said as a threat until Plaintiff said, "I'm going to get you," to which Sgt. Tyler responded, "Are you threatening me?" *Id.* ¶ 25. Plaintiff pleads that, according to Sgt. Tyler, Plaintiff "cussed" and/or said something unintelligible in response. *Id.* Sgt. Tyler allegedly then continued onto the field, finally walking away. *Id.* Plaintiff pleads Sgt. Tyler testified that he "didn't pay attention to [Cherry] after that." *Id.* Throughout their exchange, the men stood at least several yards apart and were separated by a fence. *Id.* ¶ 24. Sgt. Tyler eventually returned to the field and Plaintiff did not follow Sgt. Tyler onto the field. *Id.*

Plaintiff alleges Sgt. Tyler did not summon the police officers who were working security at the game after the encounter. *Id.* ¶ 26. Plaintiff pleads Sgt. Tyler did make a comment to Plaintiff's son's coaches about "Getting Cherry." *Id.*

### 3. **Arrest After the Game**

The same evening as the football game, Sgt. Tyler allegedly exchanged text messages with Modesto Police Lieutenant Terry Seese. *Id.* ¶ 27. Plaintiff's Complaint excerpts the exchange as follows:

> Sgt. Tyler: Nothing like Cherries [sic] dad threatening me at a football game.
> Lt. Seese: Arrest him
> Sgt. Tyler: That's the plan.
> Lt. Seese: I was joking.
> Sgt. Tyler: He knows what I do. And he is complaining about his last arrest. He thinks I set him up. I won't do it myself.
> Lt. Seese: He's an idiot / Welcome to the corral.
> Sgt. Tyler: . . . Yes he is an idiot . . .

*Id.* Plaintiff alleges that on or about the next day, November 5, 2016, Lt. Seese contacted his colleagues in the Oakdale Police Department and arranged for them to contact Sgt. Tyler.[1] *Id.* ¶ 30. Plaintiff alleges Sgt. Tyler gave a false account of events to the Oakdale police, that Plaintiff had threatened Sgt. Tyler the day before and that Sgt. Tyler had actually felt threatened. *Id.* Plaintiff claims that, according to the Oakdale Police Officer who took the statement, "Tyler stated that he wanted Cherry arrested for the threats." *Id.* Plaintiff pleads that the Modesto Police Department then arrested Plaintiff at his home the same day. *Id.* ¶¶ 31, 57. Police officers' lapel cameras were allegedly turned off during a concurrent search of Plaintiff's home. *Id.* ¶ 31.

The Stanislaus District Attorney's office charged Plaintiff with violating California Penal Code §§ 69 (threatening an officer with intent to interfere), 1361.1 (threatening a witness with intent to dissuade), and 140(a) (threat of force or violence because of prior assistance in prosecution). *Id.* ¶ 32. At the preliminary hearing on October 23, 2017, the Court dismissed the Penal Code § 69 charge (because Tyler was off duty) and the § 136.1 charge (because Tyler was not a witness to any separate

---

[1] The Oakdale Police Department is not a defendant in this case.

alleged crime), but held Cherry to answer on a newly-amended complaint alleging a violation of Penal Code § 422 (criminal threats), as well as the original § 140(a) charge. *Id.* Shortly before the scheduled jury trial, Plaintiff allegedly declined a plea offer. *Id.* ¶ 33. The day of trial, the District Attorney dismissed the case. *Id.*

**B.** **Procedural Background**

Plaintiff filed his Complaint on September 14, 2018 in this Court. ECF No. 1. Plaintiff asserts ten causes of action: (1) violation of 42 U.S.C. § 1983 for unreasonable search, seizure, arrest, detention, and/or imprisonment violation of the Fourth Amendment Right, against Defendants Tyler and Seese in their official capacities; (2) violation of 42 U.S.C. § 1983 for retaliation for, and interference with, Free Speech in violation of the First Amendment against Defendants Tyler and Seese in their official capacities; (3) violation of 42 U.S.C. § 1983 for failure to intervene against Defendants Tyler and Seese in their official capacities; (4) violation of 42 U.S.C. § 1983 for deprivation of Procedural and Substantive Due Process in violation of the Fourteenth Amendment against Defendants Tyler and Seese in their Official Capacities; (5) violation of 42 U.S.C. § 1985 and Federal Common Law for conspiracy against Defendants Tyler and Seese in their Official Capacities and Defendant Tyler in his individual capacity; (6) violation of California law for false arrest and imprisonment against Defendants Tyler and Seese in their official capacities, Defendant Tyler in his individual capacity, and the City of Modesto in *respondeat superior*; (7) violation of California law for malicious prosecution against Defendants Tyler and Seese in their individual capacities; (8) violation of California law for abuse of process against Defendants Tyler and Seese in their individual capacities; (9) violation of California law for intentional infliction of emotional distress against Defendants Tyler and Seese in their individual capacities; and (10) violation of California law for negligence against Defendants Tyler and Seese in their official capacities, Defendant Tyler in his individual capacity, and the City of Modesto in *respondeat superior*. Defendants filed this motion to dismiss on December 21, 2018. ECF No. 8. Plaintiff opposed the motion. ECF No. 11. Defendants filed a reply. ECF No. 14. Pursuant to Local Rule 230(g), the Court

determined that this matter was suitable for decision on the papers and took it under submission on February 1, 2019.  ECF No. 15.

## IV. <u>LEGAL STANDARD</u>

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the opposing party's pleadings.  Dismissal of an action under Rule 12(b)(6) is proper where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).  When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), all allegations of material fact must be accepted as true and construed in the light most favorable to the pleading party.  *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  The inquiry is generally limited to the allegations made in the complaint.  *Lazy Y Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

Under Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face."  *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants

7

have violated the . . . laws in ways that have not been alleged[.]" *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. In other words, the complaint must describe the alleged misconduct in enough detail to lay the foundation for an identified legal claim.

"Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir. 2008). To the extent that the pleadings can be cured by the allegation of additional facts, the Court will afford the plaintiff leave to amend. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

# V. <u>DISCUSSION</u>

Defendants move to dismiss Plaintiff's causes of action on the grounds that: (1) Plaintiff failed to plead with sufficient particularity that Defendants acted under color of law; (2) Plaintiff failed to state a claim for conspiracy; (3) Defendants are entitled to qualified immunity; (4) Plaintiff's failure to intervene claim is not permitted in a non-excessive force case; (4) Plaintiff's state law claims must be dismissed pursuant to the California Tort Claims Act. Plaintiff opposes all of Defendants' arguments.

## A. <u>Under Color of State Law</u>

"To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 836 (9th Cir. 1996). Municipalities are included among those persons to whom § 1983 applies. *Monell v. Dep't of Soc. Servs. of New York City*, 436 U.S. 658, 690 (1978). "[W]hether a[n] . . . officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Anderson v. Warner*, 451 F.3d 1063, 1068 (9th Cir.

2006) (internal quotation marks and citations omitted). "It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 49–50 (1988).

The Ninth Circuit has held that there are "three critical requirements" that must be satisfied when determining if an officer is acting under the color of state law. *Anderson*, 451 F.3d at 1068.

> First, the defendant's action must have been "performed while the officer is acting, purporting, or pretending to act in the performance of his or her official duties." [*McDade v. West*, 223 F.3d 1135, 1140 (9th Cir. 2000)]. Second, the officer's pretense of acting in the performance of his duties must have had the purpose and effect of influencing the behavior of others. *See Van Ort v. Estate of Stanewich*, 92 F.3d 831, 839–40 (9th Cir. 1996) (finding no color of state law because the victim had not opened the door based on defendant's status as a police officer). Third, the challenged conduct must be "related in some meaningful way either to the officer's governmental status or to the performance of his duties." [*Martinez v. Colon*, 54 F.3d 980, 987 (1st Cir. 1995)].

*Id.* at 1068–69. "Officers who engage in confrontations for personal reasons unrelated to law enforcement, and do not purport or pretend to be officers, do not act under color of law." *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1058 (9th Cir. 1998) (internal quotation marks, alterations, and citations omitted). Likewise, "acts of officers in the ambit of their personal pursuits are plainly excluded . . . [from] the words 'under color of any law.'" *Screws v. United States*, 325 U.S. 91, 111 (1945).

Here, Plaintiff pleads with sufficient particularity facts that, if assumed to be true and every reasonable inference is made in Plaintiff's favor, show Defendants were acting under color of law. The vast majority of the acts Plaintiff complains of occurred while Defendants were on duty and acting in their official capacities as law enforcement officers. Moreover, to the extent the officers were not alleged to be on duty, the *Anderson* factors weigh in favor of finding Defendants to have acted under color of law.

First, most of the alleged actions that Plaintiff argues evince a conspiracy occurred in the performance of Defendants' official duties as law enforcement officers while the officers were on duty.

In 2015, the Modesto Police Department posted the first of three "Criminal Information Bulletins" that Plaintiff alleges alerted officers to a "baseless and fabricated threat posed by Mr. Cherry," and "functioned as a blueprint for how to frame Cherry." ECF No. 1 ¶ 19. While there are conflicting allegations regarding the June 2016 confrontation with Modesto police that resulted in Plaintiff's arrest, Sgt. Tyler allegedly was involved via his questioning of Plaintiff, which for the purposes of this motion can be inferred to have occurred while he was on duty. *Id.* ¶¶ 16 ("Sgt. Tyler . . . approached Cherry, and began to question him"); *but see id.* ¶ 18 ("Sgt. Tyler did not participate in . . . the afore-described incident."). While Sgt. Tyler was not on duty during the verbal confrontation with Mr. Cherry at the football game, he told a bystander he could arrest Plaintiff "anytime he wanted." *Id.* ¶¶ 22-23. And Sgt. Tyler was on duty the next day when he allegedly gave a false account of events to the Oakdale Police Department and said that "he wanted Cherry arrested for the threats." *Id.* ¶¶ 30, 61. Moreover, Plaintiff alleges that during the football game Sgt. Tyler acted in concert with Lt. Seese, who was on duty, in a manner as if Sgt. Tyler himself was on duty at the time. *Id.* ¶¶ 27, 61. Similarly, Lt. Seese allegedly was on duty when he contacted the Oakdale Police Department and arranged for them to contact Sgt. Tyler. *Id.* ¶¶ 30, 61. In addition, the allegedly false arrest of Mr. Cherry was performed by on-duty officers of the Modesto Police Department. *Id.* ¶31. Finally, though the charge was ultimately dismissed because Sgt. Tyler was off duty, Plaintiff was initially charged with violating California Penal Code § 69 for deterring or preventing an officer from performing duties imposed upon the officer by law. *Id.* ¶ 32.

Second, the actions taken in the performance of Defendants' duties, as alleged by Plaintiff, clearly had the purpose and effect of influencing the behavior of others. At a minimum, the Defendants' alleged actions had the purpose and effect of causing the Oakdale Police Department to contact Sgt. Tyler regarding the alleged threat, causing the Oakdale Police Department to issue a warrant for Plaintiff's arrest, causing the Modesto Police Department to arrest Plaintiff, and causing the (ultimately unsuccessful) prosecution of Plaintiff by the Stanislaus District Attorney. *Id.* ¶¶ 30-34.

Third, all the above alleged conduct related in a meaningful way to the officers' performance of

their duties. Again, the gravamen of Plaintiff's allegations is that Defendants engaged in a conspiracy to perform their official police duties in a manner to target Plaintiff. As described above, nearly every major act complained of occurred while Defendants were "acting in [their] official capacit[ies] or while exercising [their] responsibilities pursuant to state law." *West*, 487 U.S. at 49–50, (1988).

The cases cited by Defendants are distinguishable. In each of those cases the off-duty police officer held not to be acting under color of law was engaged entirely in conduct as a private citizen, or otherwise was not acting pursuant to their law enforcement duties. *See Gritchen v. Collier*, 254 F.3d 807, 813 (9th Cir. 2001) ("No one suggests that threatening suit or bringing it is one of Collier's duties as a police officer. . . . Collier's decision to threaten suit is not subject to the control of the Department. Pursuing private litigation does not abuse Collier's position or authority as a police officer, and Gritchen does not argue otherwise. Beyond this, a defamation suit is quintessentially personal; it is to redress reputational injury."); *Apata v. Howard*, No. CIV.A. 05-3204, 2009 WL 29314, at *4 (D.N.J. Jan. 6, 2009) ("Although Fortenberry is a police officer, he filed the affidavit [that led to the allegedly false arrest of plaintiff] with the Willingboro police in the same fashion as would any member of the public. . . . There is no indication that Fortenberry's status as an officer influenced the Willingboro Police Department's investigation of Apata."); *Smith v. Avent*, No. 98 C 4389, 1999 WL 33891, at *2 (N.D. Ill. Jan. 15, 1999) ("Here the allegations do not concern police duties. Rather, they are directed at actions taken by Avent as a citizen filing a complaint against another citizen."); *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001) (off-duty officer did not act under color of law in calling 911 twice to report attempted break-in, resulting in Plaintiff's arrest, as officer's "action in making the 911 calls and reports to the responding officers were functionally equivalent to that of any private citizen calling for police assistance") (internal quotations omitted); *Bennings v. Kearney*, 2 F. App'x 218, 220 (2d Cir. 2001) ("Bryan Kearney, as we believe any responsible parent would, reported his daughter's allegations to the police department that had jurisdiction over the incident, which as it happened was the department at which Kearney worked. . . . Moreover, Bennings has not identified any facts that would give rise to an

inference that at any time thereafter Kearney used his authority as an officer to influence the investigation.").  In other words, in the cases cited by Defendants, "the government officials acted individually as wholly private citizens without the aid of any other government official."  *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1011 (E.D. Cal. 2017).

As described above, most of the acts alleged in furtherance of the conspiracy to have Mr. Cherry falsely arrested occurred while Defendants were on duty.  The only off-duty conduct at issue was the alleged confrontation between Mr. Cherry and Sgt. Tyler during the football game.  Yet, accepting Plaintiff's allegations as true and making every reasonable inference in his favor, Sgt. Tyler did not act as a private citizen would by, for example, reporting the threat to the on-duty officers present at the game, calling 911, or otherwise contacting the police of his own initiative.  Rather, Sgt. Tyler texted Lt. Seese, who was on duty, and Lt. Seese later arranged for the Oakdale Police to contact Sgt. Tyler while Sgt. Tyler and Lt. Seese were on duty the next day.  It is reasonable to infer from these facts that Sgt. Tyler did not report Plaintiff's threat merely as a private citizen, but rather did so in a manner relating in a meaningful way to Sgt. Tyler and Lt. Seese's performance of their duties as police officers.

Therefore, for purposes of this motion, accepting all of Plaintiff's allegations of material fact as true and construing them in the light most favorable to Plaintiff, Plaintiff has pleaded with sufficient particularity that Defendants were acting under color of law at all relevant times.

**B.**    **Failure to State a Claim for Conspiracy**

Plaintiff brings a conspiracy claim pursuant to both "federal common law" and 42 U.S.C. § 1985(2).  § 1985(2) provides a cause of action "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws. . . ."  The Ninth Circuit has held that § 1985(2) requires that a plaintiff allege "class-based animus" to state a legally sufficient claim.  *Portman v. County of Santa Clara*, 995 F.2d 898, 909 (9th Cir. 1993); *see also Bagley*, 923 F.2d at 763 ("We have held, however, that [a] cognizable claim under [the second part of § 1985(2)] requires an

allegation of a class-based, invidiously discriminatory animus." (citations and quotation marks omitted; modifications in original)), *cert. denied,* 502 U.S. 1091 (1992); *accord Whitehorn v. FCC*, 235 F. Supp. 2d 1092, 1101 (D. Nev. 2002) (noting the requirement of "class-based or racial animus"), *aff'd,* 63 Fed. App'x 346 (9th Cir. 2003). A plaintiff must also plead with particularity her membership in a class that suffers from invidious discrimination. *See Pioneer Lumber Treating, Inc. v. Cox*, 5 F.3d 539 (9th Cir. 1993).

Even assuming for the purposes of this motion that all of Plaintiff's allegations are true, Plaintiff does not allege any facts suggesting membership in a protected class, and otherwise does not allege any class-based animus or invidious discrimination to support a § 1985(2) equal protection claim. Plaintiff's pleading of the § 1985 claim consists of boilerplate quotations of the statute. *See* ECF No. 1 ¶ 87. The only suggestion of class-based, invidiously discriminatory animus in Plaintiff's complaint is Mr. Cherry's Facebook post that "CC [Central Catholic High school] employees a racist BLACK POLICE OFICER as a coach! Horrible!!!! See you in 10 wks!" ECF No. 1 ¶ 20. However, Plaintiff does not plead any additional facts elaborating on the alleged racist motivations for Defendants' actions. Such scant and, at best, indirect pleading of membership in a protected class, much less class-based animus and invidious discrimination, is insufficient. Accordingly, Plaintiff's §1985 conspiracy claim is **DISMISSED WITHOUT PREJUDICE**.

Plaintiff's second conspiracy claim is pleaded as a "federal common law" conspiracy. There is no freestanding "federal common law conspiracy" right of action. Courts have construed such claims as § 1983 conspiracy claims, and this Court does the same. *See Burdett v. Reynoso*, No. C-06-00720 JCS, 2007 WL 2429426, at *29 (N.D. Cal. Aug. 23, 2007) (finding common law conspiracy claim properly construed as § 1983 claim and collecting authority recognizing such a right of action), *aff'd,* 399 F. App'x 276 (9th Cir. 2010).

A conspiracy claim brought under § 1983 requires proof of "an agreement or meeting of the minds to violate constitutional rights," *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2001) (quoting *United Steel*

*Workers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989) (citation omitted)), and an actual deprivation of constitutional rights, *Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006) (quoting *Woodrum v. Woodward County, Okla.*, 866 F.2d 1121, 1126 (9th Cir. 1989)). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Franklin*, 312 F.3d at 441 (quoting *United Steel Workers*, 865 F.2d at 1541). Where allegations of conspiracy are involved, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *See Twombly*, 550 U.S. at 556 (discussing necessary pleading for a conspiracy claim under section 1 of the Sherman Act). "Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action." *Mendocino Envtl. Ctr. v. Mendocino County.*, 192 F.3d 1283, 1302 (9th Cir. 1999); *see also Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) ("A meeting of the minds can be inferred from circumstantial evidence . . . .").

Plaintiff's complaint is scant on pleading explicit facts regarding the alleged agreement or meeting of the minds between the Defendants to violate Plaintiff's rights, much less the details of that agreement. Nevertheless, accepting Plaintiff's allegations as true for purposes of this motion and making every reasonable inference in Plaintiff's favor, Plaintiff pleads with sufficient particularity facts to state a claim for § 1983 conspiracy. Critically, Plaintiff has pleaded facts providing sufficient circumstantial evidence permitting a reasonable inference that Defendants had an ongoing plan to violate Plaintiff's constitutional rights by having him falsely arrested.

As a threshold matter, a reasonable inference may be drawn that there is longstanding animosity (regardless of who is at fault) between Plaintiff and Defendants, as shown by the allegations regarding the series of criminal bulletins singling out Plaintiff, the June 2016 confrontation with Modesto police,

and Plaintiff's Facebook post. ECF No. 1 ¶¶ 15-21. But more critical are the events at the football game. Sgt. Tyler and his patrol captain at the Modesto Police Department allegedly knew Plaintiff would be at the football game due to Plaintiff's Facebook post. ECF No. 1 ¶¶ 20-21. Plaintiff pleads that Sgt. Tyler initiated the confrontation at the football game, and did not break off the exchange when he had an opportunity to do so. *Id.* ¶¶ 24-25. During the confrontation, prior to any alleged threat by Plaintiff, Sgt. Tyler allegedly told a bystander that "he had arrested Cherry once before and could do so any time he wanted." ECF No. 1 ¶ 24. Plaintiff pleads he did not verbally or physically threaten Sgt. Tyler. *Id.* While Plaintiff allegedly stated "I'm going to get you" to Sgt. Tyler at some point in the conversation, Plaintiff did not confirm he was intending to threaten Sgt. Tyler when pressed directly. *Id.* ¶ 25. After Plaintiff's alleged threat, Sgt. Tyler allegedly "said something in passing to Oakdale coaches about 'getting Cherry.'" *Id.* ¶ 26. Soon after, Sgt. Tyler and Lt. Seese engaged in the following exchange of text messages:

> Sgt. Tyler: Nothing like Cherries [sic] dad threatening me at a football game.
> Lt. Seese: Arrest him
> Sgt. Tyler: That's the plan.
> Lt. Seese: I was joking.
> Sgt. Tyler: He knows what I do. And he is complaining about his last arrest. He thinks I set him up. I won't do it myself.
> Lt. Seese: He's an idiot / Welcome to the corral.
> Sgt. Tyler: . . . Yes he is an idiot . . .

*Id.* ¶ 27. A reasonable inference to draw from Sgt. Tyler's statement "That's the plan" is that he and Lt. Seese had a pre-existing plan to have Plaintiff arrested, unrelated to any alleged threats at the football game. Indeed, although Defendants argue that Lt. Seese's "I was joking" response indicates that there is no conspiracy, other reasonable inferences may be drawn and, at this stage, every reasonable inference must be drawn in Plaintiff's favor. For instance, viewing the texts in the light most favorable to Plaintiff, a reasonable inference could be drawn that that Lt. Seese, upon seeing the "That's the plan" text, backtracked to say he was joking in order to cover up the conspiracy. Indeed, it seems unreasonable to infer that Lt. Seese, upon hearing an officer was threatened by the subject of multiple

criminal information bulletins, would only joke that the suspect should be arrested.  Moreover, Sgt. Tyler's statement "I won't do it myself" also implies coordination outside of normal procedure to have Plaintiff arrested.  Lt. Seese did not object or restate that he was joking in response to Sgt. Tyler implying he would have Plaintiff arrested by someone else.

Furthermore, Lt. Seese and Sgt. Tyler's coordination with Oakdale Police Department provides additional circumstantial evidence of a pre-existing agreement among the Defendants to have Plaintiff wrongfully arrested outside of normal police procedures.  The allegation that Lt. Seese contacted the Oakdale Police Department the very next day, and requested Oakdale police contact Sgt. Tyler, not only undercuts Lt. Seese's statement that he was "joking," but it also permits an inference that Lt. Seese is effectuating "the plan." *Id.* ¶ 29.  T the allegations that Sgt. Tyler did not report the threat at the time it was made or initiate the contact with the Oakdale police are further evidence that the effectuation of Plaintiff's arrest was performed outside normal law enforcement procedures.  *Id.* ¶ 25-26.  Indeed, according to Plaintiff's allegations, when contacted by Oakdale police, Sgt. Tyler performs his role in the conspiracy by giving a false version of the confrontation at the football game, and telling the Oakdale Police he wanted Plaintiff arrested.  *Id.* ¶ 30.  Inferences of misconduct also could be drawn from the arresting Modesto officers' alleged failure to turn on, or turning off, of their lapel cameras.  *Id.* ¶ 31.  Accepting Plaintiff's allegations as true, it is reasonable to infer from the above facts that there was a pre-existing "agreement or meeting of the minds" among Defendants with the shared objective of having Plaintiff falsely arrested, and the events at the football game provided Defendants the opportunity to carry out that plan.  *See Gressett v. Contra Costa County*, No. C-12-3798 EMC, 2013 WL 2156278, at *16 (N.D. Cal. May 17, 2013) ("Given the specific facts alleged regarding these Defendants' animosity to Gressett (*i.e.*, motive), their acts consistent with a conspiracy to maliciously prosecute Gressett, and the fact that these Defendants worked together within the same office, which would have offered a heightened opportunity for collusion, the claim of a conspiracy involving the Contra Costa Defendants is sufficiently plausible to satisfy *Twombly* and [*Iqbal*].") (emphasis omitted);

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1547 (9th Cir. 1989) (reversing grant of summary judgment and holding that under the circumstances, "peculiar timing and aberrant procedure," while "susceptible of innocent interpretation, . . . support a justifiable inference of conspiracy"); *Gilbrook v. City of Westminster*, 177 F.3d 839, 857 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999) ("Acts which seem otherwise innocent, when viewed in the context of the surrounding circumstances, may justify an inference of complicity.") (quoting *United States v. Batimana,* 623 F.2d 1366, 1368 (9th Cir.1980)).  Finally, Plaintiff sufficiently pleaded the above alleged conspiracy resulted in an actual constitutional deprivation, *i.e.*, his false arrest.  ECF No. 1 ¶¶ 30-36.

Therefore, Plaintiff pleads with sufficient particularity facts to support a claim for § 1983 conspiracy.

## C.     Qualified Immunity

Defendants argue that they are entitled to qualified immunity from all of Plaintiff's claims.  Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."  *Pearson v. Callahan*, 555 U.S. 223 (2009).  The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Id.* at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Further, it "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Id.*  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Id.*

To determine whether officers are entitled to qualified immunity, a court conducts a two-step inquiry.  "The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation."  *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir.

2003) (citations omitted).  "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 231.  To be a clearly established constitutional right, a right must be sufficiently clear "that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citation and internal quotation marks omitted).  "[T]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 20.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).

The Court finds Defendants are not entitled to qualified immunity as to any of Plaintiff's claims. First, Plaintiff's 42 U.S.C. § 1983 causes of action—numbers one, two, three, and four—are against Defendants Tyler and Seese in their official capacities.  ECF No. 1.  Qualified immunity is not available to defendants sued only in their official capacity.  *See Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 616 (9th Cir. 2018).  Therefore, Defendants are not presently entitled to qualified immunity from Plaintiff's first four causes of action.[2]

---

[2] The Court further notes that, while neither party raised this issue, an official capacity claim against either officer defendant is equivalent to stating a *Monell* claim for entity liability.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) ("A suit against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself."); *Monell*, 436 U.S. at 694 ("Liability may attach to a municipality only where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986) ("The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.").  Plaintiff's complaint does not plead an official policy, custom, or other basis for *Monell* liability.  Nevertheless, the Court does not decide whether Plaintiff's § 1983 official capacity claims must be dismissed under *Monell* at this time.

Second, Plaintiff's fifth claim, for § 1985 conspiracy and federal common law conspiracy (relabeled here as § 1983 conspiracy), is against Defendants Tyler and Seese in their official capacities, and against Defendant Tyler in his individual capacity. As described above, Plaintiff's § 1985 claim is dismissed without prejudice, and thus the Court does not decide at this point whether Defendants are entitled to qualified immunity on that claim. And Defendants are not entitled to qualified immunity from Plaintiff's official capacity § 1983 conspiracy claim for the same reason as the other official capacity claims. *See Daniels*, 889 F.3d at 616.

Third, Defendants are not entitled to qualified immunity from Plaintiff's state law claims, as federal qualified immunity is not available for state law claims. *See Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013) ("[T]he doctrine of qualified immunity does not shield defendants from state law claims."). Defendants do not argue any state law immunity applies.

Thus, the only claim for which qualified immunity may potentially attach is Plaintiff's claim five for § 1983 conspiracy against Sgt. Tyler in his individual capacity. However, the Court finds that Defendants are not entitled at this point to qualified immunity from Plaintiff's federal common law conspiracy claim. Applying the two-part test, first, as discussed above, Plaintiff sufficiently pleaded that Defendants' conduct violated a constitutional right. Second, the rights at issue—to be free from officials conspiring to falsely arrest a citizen and to be free from retaliation for the free exercise of First Amendment rights—have been clearly established for decades. *See, e.g., Mendocino Envtl. Ctr. v. Mendocino County*, 14 F.3d 457, 461-65 (9th Cir. 1994); *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1295, 1300-2 (9th Cir. 1999); *Caballero v. City of Concord*, 956 F.2d 204, 206 (9th Cir.1992). A reasonable officer would have understood the alleged conduct at issue to be unlawful. Defendants argue that "clearly established law provides that government officials do not act under color of law when engaging in private conduct merely because they are police officers." But, as discussed above, the Court finds Defendants were not engaged in wholly private conduct, Defendants acted under color of law, and a reasonable official would have understood that engaging in the alleged concerted

actions to violate an individual's rights violated clearly established law, even if some acts in furtherance of the conspiracy technically took place off duty. *See Anderson*, 451 F.3d at 1068-69; *West*, 487 U.S. at 49–50.

Therefore, Defendants presently are not entitled to qualified immunity as to any of Plaintiff's claims.

**D.      Failure to Intervene Claim**

Defendants argue for the first time in their reply brief that Plaintiff's failure to intervene claim must be dismissed because such claims are only available in the excessive force context. The Court is not required to entertain arguments presented for the first time in reply. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir. 2001) (district court has discretion to consider arguments raised for the first time in reply). Plaintiff did not have an opportunity to respond to this argument, and the Court declines to consider it at this time. Defendants may raise the argument in future motions.

**E.      State Law Claims**

Finally, Defendants argue that Plaintiff's state law claims should be dismissed for noncompliance with the California Tort Claims Act. Plaintiff brings state law claims for false arrest and imprisonment, malicious prosecution, abuse of process, intentional infliction of emotional distress, and negligence. Before bringing a suit against a California state or local government entity, the California Tort Claims Act ("TCA") requires the timely presentation of a written claim and the government entity's rejection of it in whole or in part. Cal. Gov't Code § 905; *Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995) (citing *Snipes v. City of Bakersfield*, 145 Cal.App.3d 861 (1983)). This is true for both individual capacity and official capacity lawsuits against employees of public entities. *See* Cal. Gov't Code § 950.2 ("a cause of action against a public employee or former public employee for injury resulting from an act or omission in the scope of his employment as a public employee is barred if an

action against the employing public entity for such injury is barred under Part 3 (commencing with Section 900) . . . ."); *Williams v. Alcala*, No. 1:17-cv-00916-DAD-SAB, 2018 WL 4039954, at *1 n.1 (E.D. Cal. Aug. 22, 2018) (collecting cases finding individual capacity suits must meet TCA requirements, but noting lack of clarity whether a plaintiff may plead around the TCA by asserting individual capacity claims).

A claim related to a cause of action for personal injury must be filed or presented to the public entity no later than six months after the cause of action accrues. Cal. Gov't Code § 911.2(a). A plaintiff must allege facts demonstrating either compliance with the TCA requirement or an excuse for noncompliance as an essential element of the cause of action. *State of California v. Superior Court (Bodde)*, 32 Cal. 4th 1234, 1243–44 (2004). Failure to allege compliance or an excuse for noncompliance constitutes a failure to state a cause of action and subjects such claims to dismissal. *See id.* But a party may make a written application to the public entity for leave to present that claim, but such an application must be made within one year of accrual of the cause of action. Cal. Gov't Code § 911.4(b). If this application is denied, under Cal. Gov't Code § 946.6, a would-be claimant may petition a court for an order relieving the petitioner from the requirement of Cal. Gov't Code § 945.4 to present a timely claim to the Board. A party must file such a petition within six months after the application to the board is denied or deemed to be denied. Cal. Gov't Code § 946.6(b). "The proper court for filing the petition is a superior court that would be a proper court for the trial of an action on the cause of action to which the claim relates." Cal. Gov't Code § 946.6(a). Although federal courts do not have jurisdiction over § 946.6 petitions, it is proper for federal courts to determine whether a plaintiff bringing tort claims against a public entity has complied with the TCA. *See United States v. State of Cal.*, 655 F.2d at 918-19.

## 1. Timeliness of Plaintiff's State Law Claims

Here, Plaintiff was required to present his claim for any tort against California public entities no later than six months after the accrual of the claim. Cal. Gov't Code § 911.2. Plaintiff was arrested on

November 5, 2016, and at the time of the arrest, knew it was due to a false report. ECF No. 1 ¶ 30; Cal. Gov't Code § 901 ("For the purpose of computing the time limits prescribed by Sections 911.2 . . . the date of the accrual of a cause of action to which a claim relates is the date upon which the cause of action would be deemed to have accrued within the meaning of the statute of limitations which would be applicable thereto if there were no requirement that a claim be presented to and be acted upon by the public entity before an action could be commenced thereon."); *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999) ("The general rule for defining the accrual of a cause of action sets the date as the time when, under the substantive law, the wrongful act is done, or the wrongful result occurs, and the consequent liability arises.") (internal citations and quotations omitted). All of Plaintiff's state law claims are rooted in the allegedly false arrest. Therefore, Plaintiff's state law claims accrued on November 5, 2016, and he was required to submit his claims by May 5, 2017 or apply for leave to present a claim by November 5, 2017.

Plaintiff did not submit his tort claims, along with an application for later consideration, until June 25, 2018, more than a year and a half after his arrest, and well after the expiration of the period to submit his claim or apply for leave to submit a claim. The City rejected Plaintiff's tort claims and application for leave on August 10, 2018. ECF No. 1 ¶ 43. Therefore, unless an exception applies, Plaintiff's state law claims are untimely under the TCA.

**2.** **The Delayed Discovery Rule**

Plaintiff argues the doctrine of delayed discovery tolled the TCA's statute of limitations. The delayed discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005); *see also Estate of Victorianne v. County of San Diego*, No. 14CV2170 WQH (BLM), 2016 WL 411292, at *12 (S.D. Cal. Feb. 3, 2016) (applying delayed discovery rule in TCA case); *Brandon G. v. Gray*, 111 Cal. App. 4th 29, 35 (2003) (same). The statute of limitations begins to run when "the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to

her." *Clark v. Baxter Healthcare Corp.*, 83 Cal. App. 4th 1048, 1055 (2000) (*quoting Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, (1988)); *Fox*, 35 Cal. 4th at 807-8 (discovery rule tolls statute until "until the plaintiff has, or should have, inquiry notice" thereof); *see also Norgart*, 21 Cal. 4th at 397-98. A plaintiff has reason to discover the injury when she has "notice or information of circumstances to put a reasonable person on *inquiry*." *Jolly*, 44 Cal. 3d at 1110-11 (emphasis in original) (internal quotation marks omitted) (quoting *Gutierrez v. Mofid*, 39 Cal. 3d 892, 896-97 (1985)). "[P]laintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." *Fox*, 35 Cal. 4th at 808.

"In order to rely on the discovery rule for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Id.* at 808 (quoting *McKelvey v. Boeing N. Am., Inc.*, 74 Cal. App. 4th 151, 160 (1999)); *E-Fab, Inc. v. Accountants, Inc. Servs.*, 153 Cal. App. 4th 1308, 1319 (2007) (same). The burden is on the plaintiff to plead facts establishing that the delayed discovery rule applies. *See Fox*, 35 Cal. 4th at 808; *Samuels v. Mix*, 22 Cal. 4th 1, 14 (1999).

Plaintiff's arrest occurred on November 5, 2016. ECF No. 1 ¶ 31. However, Plaintiff argues that the accrual of his claims should be delayed until March 1, 2018, the date Plaintiff allegedly learned of the texts between Lt. Seese and Sgt. Tyler. ECF No. 1 ¶ 38. The Court finds that the delayed discovery doctrine does not apply. Plaintiff would have known at the moment of arrest that it was wrongful, because Plaintiff alleges that Sgt. Tyler lied about the events at the football game to suborn the arrest. Thus, at the time of arrest Plaintiff discovered or had reason to discover his causes of action. At the very least, Plaintiff certainly had "notice or information of circumstances to put a reasonable person on *inquiry*." *Jolly*, 44 Cal. 3d at 1110-11 (emphasis in original) (internal quotation marks omitted) (quoting *Gutierrez v. Mofid*, 39 Cal. 3d 892, 896-97 (1985)). At the time of his arrest, Plaintiff had all the information he needed to be aware of the injury and to present his claim to the government entity,

namely that Sgt. Tyler allegedly lied about Plaintiff making threats, resulting in Plaintiff's arrest. The discovery of the test messages was not the first notice to Plaintiff of any injury. Plaintiff pleads no facts to explain why he was not on inquiry notice at the time of the false arrest, and or why he otherwise could not have discovered his injuries with reasonable diligence.

Plaintiff's argument that he did not know of his state law claims against Lt. Seese's until the text messages were revealed is stronger. However, Plaintiff does not plead any facts suggesting why a reasonable investigation would not have revealed Lt. Seese's role in the false arrest. And while Plaintiff claims that this is the first point he realized there was a conspiracy to suborn his arrest, none of Plaintiff's state law claims are for civil conspiracy, and, again, Plaintiff fails to explain why the false arrest did not put him on inquiry notice when it is the core of all his state law claims. *See* ECF No. 1 ¶¶ 92, 101, 109, 115, 120-21.[3] Plaintiff failed to plead why he would not have discovered his claims against Lt. Seese, had he pursued the wrongful arrest claim against Sgt. Tyler with reasonable diligence.

Therefore, Plaintiff has not pleaded with sufficient particularity that he is entitled to application of the delayed discovery rule.

**3.** **Leave to Petition Superior Court**

Plaintiff requests that if the Court finds the delayed discovery rule inapplicable, the Court refer the question to state court under Gov't Code § 946(a) for a determination of whether Plaintiff's circumstances constituted "surprise" and "excusable neglect." Plaintiff does not allege he has petitioned the Fresno County Superior Court for relief under § 946(a). Plaintiff provides no statutory authority or case law providing any procedural mechanism to carry out his request that "the question [to] be referred to the state court." Indeed, it is unclear what exact relief Plaintiff is requesting via "refer[al]," *e.g.*, whether Plaintiff is requesting this entire case be remanded to state court, or this Court requests the

---

[3] It is arguable that Plaintiff's state law malicious prosecution claim did not accrue until the actual prosecution was initiated by the Stanislaus County District Attorney's office on December 29, 2016. ECF No. 1 ¶ 101. But even accepting that accrual date, Plaintiff's malicious prosecution claim would remain untimely under the TCA.

Fresno County Superior Court to issue an advisory opinion.[4]  *See Garza v. Alvara*, No. 1:15-cv-00234-DAD-SKO, 2016 WL 4899676, at *2 (E.D. Cal. Sept. 14, 2016) ("California Government Code § 946.6[] does not provide a procedure for remand, and plaintiff has not demonstrated here that such relief is possible or appropriate in any event.").

Regardless, such leave would be futile.  A petition to the state superior court must be filed within six months after the application for leave to a file a late claim is denied.  Cal. Gov't Code 946.6(b).  Plaintiff's application for leave to file a late claim was denied on August 10, 2018, and thus the six-month period to petition the superior court expired February 10, 2019.  *See Givens v. County of Sacramento*, No. 2:15-cv-0720-JAM-KJN-PS, 2016 WL 6599810, at *7 (E.D. Cal. Nov. 7, 2016) (finding state tort claims barred due to plaintiff's failure to file petition in state court with six months after application for leave to file late claim denied).  Moreover, 946.6(c) states "the court shall relieve the petitioner from the requirements of Section 945.4 if the court finds that the application to the board under Section 911.4 was made within a reasonable time not to exceed that specified in subdivision (b) of Section 911.4 . . . ."  § 911.4(b) states an application must be made "within a reasonable time not to exceed one year after the accrual of the cause of action . . . ."  Here, Plaintiff's claims accrued on November 5, 2016, but he did not make his application until June 25, 2018, well outside the statute's one-year period to make his application.  *See Jacome v. Vlahakis*, No. 18CV0010-GPC-MDD, 2018 WL 6326307, at *4 (S.D. Cal. Dec. 3, 2018) (citing California cases holding that "failure to file a late-claim application within the one-year period specified in section 911.4 divests courts of jurisdiction to grant claim-relief pursuant to Section 946.6").

---

[4] To the extent Plaintiff is requesting this Court grant relief pursuant to § 946.6, the majority of courts of this Circuit to examine the issue have found that United States district courts lack the authority to grant § 946.6 relief under the plain language of the statute.  *See* Cal. Gov't Code § 946.6 ("The proper court for filing the petition is a *superior court* that would be a proper court for the trial of an action on the cause of action to which the claim relates.") (emphasis added); *Elrawi v. Burgess*, No. 5:17-cv-02463 DMG-MAA, 2018 WL 4223652, at *7 (C.D. Cal. Sept. 5, 2018) (noting majority of district courts have concluded that § 946.6 only refers to state superior courts); *Guerrero v. Cty. of Alameda*, No. C 18-02379 WHA, 2018 WL 3646818, at *3 (N.D. Cal. Aug. 1, 2018) (finding the majority position to be the correct one and noting that district courts holding differently did so based on language in §946.6 that has since been amended).

Therefore, Plaintiff's state law claims are barred by the California Tort Claims Act and Defendants' motion to dismiss Plaintiff's state law claims is **GRANTED WITH LEAVE TO AMEND**. Plaintiff will be provided an opportunity to amend his complaint to plead with sufficient particularity the facts necessary to apply the delayed discovery rule, or otherwise plead facts demonstrating compliance with the TCA's requirements.

## VI. <u>CONCLUSION AND ORDER</u>

For the reasons stated above, Defendants' motion to dismiss is **GRANTED IN PART** with leave to amend claims V (as to 42 U.S.C. §1985 Conspiracy only), VI, VII, VIII, IX, and X. Defendants' motion to dismiss is **OTHERWISE DENIED**. Plaintiff shall have twenty (20) days from electronic service of this Order to file an amended complaint.

IT IS SO ORDERED.

Dated:  __**March 6, 2019**__          _____**/s/ Lawrence J. O'Neill**_____
                                                        UNITED STATES CHIEF DISTRICT JUDGE