UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADORTHUS CHERRY,<br><br>Plaintiff,<br><br>v.<br><br>JAMES "DERRICK" TYLER; TERRY SEESE; the CITY OF MODESTO; and DOES 1 through 10, inclusive,<br><br>Defendants. | No.  1:18-cv-01268-NONE-EPG<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND REASSIGNING CASE<br><br>(Doc. Nos. 42, 43) |

Presently before the court are the parties' cross-motions for summary judgment ("MSJ"). (Doc. Nos. 42, 43.)  The motions were fully briefed.  (Doc. Nos. 44–49.)  Pursuant to Local Rule 230(g) and General Order No. 617, the court took the motions under submission on the papers without holding a hearing.  For the reasons set forth below, the court will grant in part and deny in part defendants' motion for summary judgment and deny plaintiff's motion for partial summary judgment.[1]

---

[1]  The undersigned apologizes for the excessive delay in the issuance of this order.  This court's overwhelming caseload has been well publicized and the long-standing lack of judicial resources in this district long-ago reached crisis proportion.  That situation, which continued unabated for over twenty-two months but has now been partially addressed by the U.S. Senate's confirmation of a new district judge for this court on December 17, 2021, left the undersigned presiding over 1,300 civil cases and criminal matters involving 735 defendants at last count.  Unfortunately, that situation sometimes results in the court not being able to issue orders in submitted civil matters within an acceptable period of time.  This situation has been frustrating to the court, which fully realizes how incredibly frustrating it is to the parties and their counsel.

**BACKGROUND**

**A.     Factual Background**

Plaintiff is a former resident of Modesto and a former professional body builder.  (Pl.'s MSJ, Doc. No. 43-1 at 6.)  Defendant Tyler is a sergeant in the Modesto Police Department ("MPD") and volunteered as a junior varsity football coach for Modesto Central Catholic High School ("Central Catholic").  (Defs.' MSJ, Doc. No. 42 at 10.)  Plaintiff and defendant Tyler were previously acquainted, with defendant Tyler once attempting to recruit plaintiff's eldest son, who was a star football player at Oakdale High School, to play for Central Catholic.  (*Id.*; Pl.'s MSJ, Doc. No. 43-1 at 6.)  Defendant Seese is a lieutenant with the MPD and a former supervisor of defendant Tyler.  (Ex. M, Tyler Dep., Doc. No. 45-11 at 34; Ex. N, Seese Dep., Doc. No. 45-12 at 4.)

Both parties have submitted statements of undisputed facts in support of their motions for summary judgment.  (Doc. Nos. 42-1, 43-2; *see also* Doc. No. 45-2 (same as plaintiff's statement of undisputed facts filed with his own motion for partial summary judgment but labeled "Statement of Disputed Facts").)  Each party has also filed responses to the other's statement of undisputed facts.  (Doc. Nos. 44-1, 45-1.)  Finally, both parties have submitted a voluminous amount of evidentiary material in connection with the pending cross-motions for summary judgment.  The court has reviewed the evidence before it on summary judgment, and now summarizes the facts as established by the evidence.  Unless otherwise noted, the following facts are largely undisputed.

1.     Plaintiff's Initial Contacts with MPD and Defendant Tyler

On January 9, 2015, the MPD released a criminal information bulletin regarding plaintiff and his wife titled, "Officer Safety."  (Ex. A, Rosenfeld Decl., Doc. No. 43-4 at 1.)  The bulletin provided as follows:

> [Plaintiff] is a former professional body builder with arrests for cultivation of marijuana and poss[ession] / sales of steroids. [Plaintiff] has possessed firearms in his home and vehicle in the past. He and his wife [] are mostly uncooperative with law enforcement and [plaintiff] often videos officers with his telephone and /or from cameras outside his home.  During his contacts with officers[,] he attempts to bait officers with his demeanor into unwarranted uses of

2

1
2
3
4

> force or inappropriate arrests.  He often posts videos or photographs of interactions with officers on the internet.  [Plaintiff] is the subject of several restraining orders and appears to enjoy controversy and conflict with others including his family.  His statements generally have not met the elements of terrorists threats, though his demeanor can be threatening.  The Cherry's have several civil cases in litigation as well.

5   (*Id.*)  Both defendants Tyler and Seese received this bulletin by email.  (Ex. M, Tyler Dep., Doc.

6   No. 43-11 at 8–9; Ex. N, Seese Dep., Doc. No. 43-12 at 5.)

7          According to plaintiff, on June 9, 2016, he drove his wife's vehicle to downtown Modesto

8   to pay his water bill and parked down the street from MPD.  (Pl.'s MSJ, Doc. No. 43-1 at 7; Ex.

9   O, Cherry Dep., Doc. No. 43-13 at 13, 24.)  While there, plaintiff was standing outside the MPD

10  on the sidewalk and filming the area with his cell phone camera when Sergeant Garrett Crawford

11  confronted him and repeatedly asked plaintiff if the police could help him with anything.  (Pl.'s

12  MSJ, Doc. No. 43-1 at 7; Defs.' Response Pl.'s Statement of Undisputed Facts, Doc. No. 44-1 ¶

13  3; *see also* Ex. A, Tyler Decl., Doc. No. 42-2 at 0:58–2:10 (video from the body-worn camera of

14  Sergeant Crawford) ("Crawford Video") (showing Sergeant Crawford telling plaintiff that

15  dispatch said the camera outside the MPD building captured plaintiff pushing buttons at the gate

16  or door, but plaintiff denied being at the gate).)  After a verbal exchange, plaintiff asked if he

17  committed a crime or if he was being detained, to which Sergeant Crawford answered "no," and

18  the two men began to walk away from each other.  (Crawford Video at 1:47–2:45.)  During this

19  time, defendant Tyler heard plaintiff's name come across the radio and recognized him from

20  coaching football and seeing him around town.  (Tyler Decl., Doc. No. 42-2 ¶ 4.)  According to

21  defendant Tyler, "[t]he radio announcements described confrontational behavior by Plaintiff

22  outside of the patrol building," so defendant Tyler left the patrol building to find plaintiff and the

23  other MPD officers on the sidewalk.  (*Id.* ¶ 5.)  Defendant Tyler states that his "purpose for

24  approaching Plaintiff and the other officers was to try to de-escalate any confrontation."  (*Id.* ¶ 6;

25  *see* Crawford Video at 2:24 (showing defendant Tyler standing next to a parked vehicle).)

26  Sergeant Crawford walked past defendant Tyler toward the police station, at which point

27  defendant Tyler and plaintiff conversed about what had just happened.  (Tyler Decl., Doc. No.

28  42-2 ¶ 12; Ex. O, Cherry Dep., Doc. No. 43-13 at 8; Crawford Video at 2:24.)

1      Before reaching the door to the police station, Sergeant Crawford turned around and then

2  asked another officer, "He's probation searchable, right?"  (Crawford Video at 2:46–2:48.)  When

3  the other officer confirmed that plaintiff was on searchable probation, Sergeant Crawford said,

4  "Let's go and search him."  (*Id.* at 2:48–2:55.)  Sergeant Crawford then returned to the area where

5  plaintiff stood and asked plaintiff if he was on probation.  (*Id.* at 2:58–3:00.)  When plaintiff said

6  "yes," Sergeant Crawford said they were going to conduct a probation search, handcuffed

7  plaintiff and began searching him.  (*Id.* at 3:00–3:43 (showing defendant Tyler standing behind

8  plaintiff).)  The officers also searched the vehicle plaintiff had driven to the police station

9  (plaintiff stated it was his wife's vehicle), during which they found a loaded gun magazine.  (*Id.*

10  at 7:20–7:25.)  Sergeant Crawford directed defendant Tyler to take plaintiff into the police station

11  and place him in a holding cell, which defendant Tyler did.  (*Id.* at 8:26–8:36, 9:20–9:46; Ex. M,

12  Tyler Dep., Doc. No. 43-11 at 11.)  A probation search of plaintiff's residence was also conducted

13  which uncovered over 50 marijuana plants, several swords, and empty handgun rifle cases.  (*See*

14  Ex. A, Rosenfeld Decl., Doc. No. 43-4 at 2.)  Plaintiff was placed under arrest following the

15  execution of the search.  (*Id.*)

16      Plaintiff blamed defendant Tyler for not intervening in his arrest, believing that defendant

17  Tyler only talked to him outside the police station to provide the other officers time to realize that

18  plaintiff was on probation.  (Ex. O, Cherry Dep., Doc. No. 43-13 at 14.)  A few months later, on

19  August 26, 2016, defendant Tyler was driving his police vehicle when he happened to pull up

20  beside plaintiff and his family stopped at a stop light in Modesto.  (*Id.* at 10–11; Ex. M, Tyler

21  Dep., Doc. No. 43-11 at 19–20.)  Defendant Tyler spoke to plaintiff's son, who was sitting in the

22  front passenger seat of plaintiff's car, but plaintiff responded, "[D]on't fucking talk to my son,

23  you are not friends with my family."  (Ex. O, Cherry Dep., Doc. No. 43-13 at 11.)

24      Soon after this encounter, plaintiff posted the following on the Facebook page of the

25  Central Catholic football team:  "CC employ[]s a racist BLACK POLICE OFFICER as a coach!

26  Horrible!!!!  See you in 10 wks!"  (Ex. B, Rosenfield Decl., Doc. No. 43-5 (including a picture of

27  defendant Tyler in his police uniform).)  The "10 wks" referred to the upcoming rival football

28  game between Central Catholic and Oakdale high schools on November 4, 2016.  (Ex. M, Tyler

Dep., Doc. No. 43-11 at 17; Ex. O, Cherry Dep., Doc. No. 43-13 at 15.)  When defendant Tyler learned of the post, he notified his command staff, including defendant Seese.  (Tyler Decl., Doc. No. 42-2 ¶ 20; Ex. M, Tyler Dep., Doc. No. 43-11 at 15.)  Defendant Tyler stated that he wanted to raise awareness that plaintiff was posting things related to defendant Tyler's work conduct given that the Facebook post referred to him as a racist police officer and included a picture of him in his police uniform.  (Ex. M, Tyler Dep., Doc. No. 43-11 at 16.)  Nonetheless, defendant Tyler stated that he still planned to go to the game and coach for the Central Catholic team and learned that defendant Seese would also be in attendance because his son played on the Oakdale High School football team.  (*Id.*)

2.      Confrontation Between Plaintiff and Defendant Tyler at the Football Game

On November 4, 2016, plaintiff and defendant Tyler both attended the football game between rivals Central Catholic and Oakdale high schools.  (Pl.'s Response Defs.' Statement of Undisputed Facts, Doc. No. 45-1 ¶ 1.)  Defendant Tyler was not on duty or wearing his police uniform at the game, and instead was serving as a volunteer coach for the Central Catholic team. (*See* Tyler Decl., Doc. No. 42-2 ¶ 16; Ex. Q, Miranda Dep., Doc. No. 45-15 at 3 (witness stating that defendant Tyler was not dressed as a police officer but as a coach because "he had the Central Catholic gear on that other coaches were wearing").)  Nonetheless, defendant Tyler was carrying a fully loaded Glock pistol concealed on his hip.  (Pl.'s Statement of Undisputed Facts, Doc. No. 43-2 ¶ 19; Ex. M, Tyler Dep., Doc. No. 43-11 at 22–23 (stating it was his personal and off-duty firearm).)  Plaintiff and defendant Tyler provide slightly disputed accounts of what transpired at the football game.

According to defendant Tyler's version of the events, during halftime of the game, defendant Tyler exited the field to put his jacket in his car and use the restroom.  (Ex. M, Tyler Dep., Doc. No. 43-11 at 23–24.)  As he was walking back from the restroom along the north side of the field, defendant Tyler saw plaintiff standing outside the fence and said to plaintiff, "What's up?"  (Tyler Decl., Doc. No. 42-2 ¶ 17.)  In response, plaintiff said, "You set me up. . . .  You and your boys set me up!"  (*Id.*; Ex. M., Tyler Dep., Doc. No. 43-11 at 36.)  Defendant Tyler then said, "What are you talking about?"  (Tyler Decl., Doc. No. 42-2 ¶ 18; Ex. M., Tyler Dep., Doc.

No. 43-11 at 36.)  Plaintiff continued to accuse defendant Tyler of "setting him up" and defendant Tyler assumed plaintiff was referring to the June 9, 2016 incident that occurred outside the MPD. (*Id.*)  Defendant Tyler testified that he told plaintiff, "Just go watch your son," and plaintiff responded, "You guys are fucking punks and cowards."  (Ex. M., Tyler Dep., Doc. No. 43-11 at 36; Defs.' Statement of Undisputed Facts, Doc. No. 42-1 ¶¶ 5–6.)  Next, according to defendant Tyler, he turned around and walked away from plaintiff.  (Ex. M., Tyler Dep., Doc. No. 43-11 at 36.)  Defendant Tyler claims that plaintiff then threatened him by saying, "I'm going to get you. I'm going to see you around."  (*Id.* at 29.)  Defendant Tyler turned around and responded, "[A]re you threatening me?"  (*Id.* at 28.)  Turning back around toward the field, according to defendant Tyler, he saw some Oakdale coaches ten to fifteen yards ahead of him and said to them, "hey, this guy's threatening me," and asked if someone could "deal with [plaintiff]."  (Ex. M, Tyler Dep., Doc. No. 43-11 at 28.)  Defendant Tyler subsequently walked back to his team's bench on the field.  (*Id.*)

Plaintiff offers a slightly different version of the events of that night.  According to plaintiff, he was standing behind a fence at the end zone area at the north end of the field to greet and cheer on his son as his team reentered the field following halftime.  (Ex. O, Cherry Dep., Doc. No. 43-13 at 17–18.)  Plaintiff next heard someone from behind say to him, "What's up, Cherry?"  (*Id.*)  After turning around and realizing that it was defendant Tyler speaking to him, plaintiff stopped and said, "Let's talk about [it]."  (*Id.* at 18.)  Defendant Tyler responded that he did not know what plaintiff was talking about and a verbal altercation ensued with plaintiff accusing defendant Tyler of "setting him up" to be arrested on June 9, 2016.  (*Id.* at 17; *see also* Pl.'s Statement of Disputed Facts, Doc. No. 45-2 ¶ 24.)  At one point, defendant Tyler said to plaintiff, "Go watch your fricking son play ball," to which plaintiff responded, "[Y]ou guys are fucking punks and cowards."  (Ex. O, Cherry Dep., Doc. No. 42-5 at 184; Pl.'s Responses Defs.' Statement of Undisputed Facts, Doc. No. 45-1 ¶¶ 5–6.)  Plaintiff denies saying to defendant Tyler, "I'm going to get you.  I'm going to see you around."  (Ex. O, Cherry Dep., Doc. No. 43-13 at 19.)  Instead, plaintiff recalled saying, "I'll catch you later."  (*Id.*)  Regardless, defendant Tyler responded, "Are you threatening me?"  (Pl.'s Responses Defs.' Statement of Undisputed

6

1  Facts, Doc. No. 45-1 ¶ 7.)  According to plaintiff, his response to defendant Tyler's question was,

2  "Are you kidding me?  No, it's not a threat."  (Ex. O, Cherry Dep., Doc. No. 43-13 at 19; Pl.'s

3  Responses Defs.' Statement of Undisputed Facts, Doc. No. 45-1 ¶ 7.)  Throughout this encounter,

4  plaintiff states that defendant Tyler walked onto the football field, but plaintiff did not follow him

5  or walk through the gate onto the field.  (Pl.'s Statement of Disputed Facts, Doc. No. 45-2 ¶¶ 26–

6  27; *see also* Ex. Q., Miranda Dep., Doc. No. 45-15 at 3.)

7         Matthew Miranda, a coach with the Oakdale team, witnessed this verbal exchange but

8  assumed it was an altercation between a parent and a coach.  (Ex. Q., Miranda Dep., Doc. No. 45-

9  15 at 3 (stating he did not know at the time that defendant Tyler was a police officer and that he

10  did not know him before that night).)  Nonetheless, coach Miranda sought to deescalate the

11  situation by asking defendant Tyler to walk away.  (*Id.*)  When asked at his deposition why he did

12  not ask plaintiff to walk away, coach Miranda explained that defendant Tyler was on the field

13  with him while plaintiff was not on the field but instead was "standing by one of the fences where

14  parents stand."  (*Id.*)  Coach Miranda also testified that he did not see plaintiff make any physical

15  or aggressive gestures or moves toward defendant Tyler but did hear plaintiff say, "we can meet

16  in the parking lot."  (*Id.* at 4.)  Other than that phrase, coach Miranda stated that "there was

17  nothing said that [he] would consider threatening or aggressive."  (*Id.*)  Moreover, coach Miranda

18  testified that he did not observe plaintiff enter the field.  (*Id.* at 3.)

19         As they walked away from plaintiff and further onto the field, coach Miranda said to

20  defendant Tyler, "Hey, just calm down.  Let's go coach a football game.  I don't know what's

21  going on, but just go to your sideline."  (Ex. Q, Miranda Dep., Doc. No. 45-15 at 4.)  According

22  to coach Miranda, defendant Tyler responded, "they got him once and we can get him again."

23  (*Id.*)

24         Defendant Seese was off-duty and was at the same football game to watch his son play.

25  (Pl.'s Responses Defs.' Statement of Undisputed Facts, Doc. No. 45-1 ¶ 18.)  For months,

26  defendants Tyler and Seese had been distant because defendant Tyler filed a grievance against

27  defendant Seese for racial discrimination; defendant Seese was no longer defendant Tyler's

28  supervisor as of May or June 2016.  (*Id.* ¶ 21; Ex. N, Seese Dep., Doc. No. 45-12 at 4.)

7

According to defendant Tyler, aside from "notif[ying] Seese and the rest of [his] command staff of Plaintiff's social media post . . ., [defendant Tyler] never had any communication with Seese about Plaintiff prior to" the football game.  (Tyler Decl., Doc. No. 42-2 ¶ 20; Ex. N, Seese Dep., Doc. No. 45-12 at 7–8 (confirming that defendants Seese and Tyler did not communicate by phone or in person for months prior to the football game).)  Nonetheless, after his verbal altercation with plaintiff at the game, defendant Tyler texted defendant Seese:

> Defendant Tyler:  Nothing like Cherries [sic] dad threatening me at a football game.
>
> Defendant Seese:  Arrest him
>
> Defendant Tyler:  That[']s the plan.
>
> Defendant Seese:  I was joking.
>
> Defendant Tyler:  He knows what [I] do.  And he is complaining about his last arrest.  He thinks I set him up.  I won[']t do it myself.
>
> Defendant Seese:  He's an idiot / Welcome to the corral.
>
> Defendant Tyler:  . . .  Yes he is an idiot. . . .

(Ex. D, Rosenfeld Decl., Doc. No. 43-7 at 1; *see* Pl.'s Responses Defs.' Statement of Undisputed Facts, Doc. No. 45-1 ¶ 18.)[2]  Defendant Seese testified that he was surprised to receive these texts from defendant Tyler given his filing of an employment grievance against defendant Seese and that Tyler's text to him was "out of the blue."  (Ex. N, Seese Dep., Doc. No. 45-12 at 7.)  In the end, defendant Tyler left the football game early, went home, and intended to make a decision the following day as to whether to take any action against plaintiff.  (Ex. M, Tyler Dep., Doc. No. 43-11 at 34–35.)

---

[2]  Plaintiff asserts that defendant Seese first instructed defendant Tyler to arrest plaintiff "without knowing anything about what had transpired."  (Pl.'s MSJ, Doc. No. 43-1 at 13.)  Even after he said he was joking, according to plaintiff, defendant Seese "did not further seek to discourage, or even question, [defendant] Tyler when Tyler indicated he would carry out 'the plan' by having someone else effectuate the arrest."  (*Id.*)  If anything, plaintiff claims, defendant Seese "egged" defendant Tyler on by calling plaintiff "an idiot."  (*Id.*; *see also* Pl.'s Responses Defs.' Statement of Undisputed Facts, Doc. No. 45-1 ¶ 25 ("Seese ordered Tyler to arrest [plaintiff]; did not question or contradict the plan to get [Oakdale Police Department] to issue the I&B for [plaintiff]'s arrest; and did not take any action to prevent Seese's own underlings in the MPD from carrying out [plaintiff]'s physical arrest on November 5, 2016.").)

It is undisputed on summary judgment that during the football game, defendant Tyler "did not arrest or attempt to arrest Plaintiff, detain or attempt to detain him, search or attempt to search him, give or attempt to give him any orders, or brandish a weapon, gun, or badge." (Pl.'s Responses Defs.' Statement of Undisputed Facts, Doc. No. 45-1 ¶ 9.)  Other than his text messages to defendant Seese, it is further undisputed that defendant Tyler did not contact law enforcement or seek out security at the football game.  (Ex. M, Tyler Dep., Doc. No. 43-11 at 34; Pl.'s Statement of Disputed Facts, Doc. No. 45-2 ¶ 29.1.)

3.   Plaintiff's Arrest and State Court Proceedings

On November 5, 2016, the day after the football game, defendant Tyler was off-duty and at his home when he called his supervisor, Captain Craig Gundlach.  (Ex. M, Tyler Dep., Doc. No. 43-11 at 35–36; Gundlach Decl., Doc. No. 42-3 ¶ 5.)  According to Captain Gundlach, defendant Tyler told him about the confrontation outside the police station on June 9, plaintiff's Facebook post, and defendant Tyler's confrontation with plaintiff at the football game.  (Ex. M, Tyler Dep., Doc. No. 43-11 at 35; Gundlach Decl., Doc. No. 42-3 ¶¶ 6–10.)  After listening to defendant Tyler, Captain Gundlach did not consider defendant Tyler's account of the incident at the football game to be "a formal report provided by a law enforcement officer for MPD law enforcement purposes" and, if he had, he would have "ordered Tyler to prepare a written police report of the incident." (*Id.* ¶ 11.)  Instead, Captain Gundlach "viewed Tyler's report of the incident as a report concerning a personal matter where Tyler was the victim of an apparent crime under the jurisdiction of the Oakdale Police Department [('OPD')]." (*Id.*)  However, Captain Gundlach remained concerned that defendant Tyler "had been threatened, and that the threats were ostensibly in response to him doing his job on behalf of MPD when he was present during the June 9 Incident." (*Id.* ¶ 12.)

Captain Gundlach offered to and did contact OPD himself "to tell them that one of [his] subordinates had been involved in an off-duty incident in Oakdale and wanted to report the incident to [OPD]." (*Id.* ¶ 13; *see* Ex. M, Tyler Dep., Doc. No. 43-11 at 35 (stating that Captain Gundlach would call OPD and that someone from OPD would call defendant Tyler).)  However, Captain Gundlach declared that he only provided defendant Tyler's contact information and "did

1   not request or demand that [OPD] take any particular action," believing that OPD "would

2   investigate the incident and take appropriate action based on its independent investigation."

3   (Gundlach Decl., Doc. No. 42-3 ¶ 13.)

4         Later that same day, Sergeant Joseph Carrillo from OPD called defendant Tyler, who was

5   still off-duty.  (Ex. M, Tyler Dep., Doc. No. 43-11 at 36; *see* Ex. D, Tyler Decl., Doc. No. 42-2 at

6   10–14 (Sergeant Carrillo's redacted police report).)  Defendant Tyler again recounted his past

7   relationship with plaintiff, the June 9 incident, plaintiff's Facebook post, and his confrontation

8   with plaintiff at the November 4 football game.  (Ex. D, Tyler Decl., Doc. No. 42-2 at 13–14; Ex.

9   M, Tyler Dep., Doc. No. 43-11 at 36 (stating that defendant Tyler later reviewed his statement

10  and Sergeant Carrillo's police report and found no substantive or significant errors).)  The police

11  report provided the following account of the football game incident by defendant Tyler:

12              Tyler stated that last night, Friday, November 4th, while he was
13              coaching football at the Oakdale High School, near the end of half
                time (2030 hours) Tyler was on his way to the football field at the
14              north end of the stadium.  [Plaintiff] was present, standing near the
                gated entrance to the field.  While walking past [plaintiff] to enter the
15              field, [plaintiff] said something to him.  While he was walking about
                3 feet from [plaintiff] as he was going to enter the field, [plaintiff]
16              followed Tyler to the entrance saying something similar to, "That's
                bullshit . . .  You set me up and had me arrested . . .  You're a punk
17              . . . I'm going to get you . . . I'll see you around."

18              Tyler reported the incident to an Oakdale High School football team
                staff member who was nearby.  Tyler said that the unknown staff
19              member (a bearded WMA [white male adult] in his 30's) might have
                heard [plaintiff] making the threats.  However, the male stated that
20              he would call someone to handle the incident.

21  (Ex. D, Tyler Decl., Doc. No. 42-2 at 13–14; *but see* Pl.'s MSJ, Doc. No. 43-1 at 14 ("But Sgt.

22  Carrillo's report materially contradicts Sgt. Tyler's sworn testimony by stating, 'While walking

23  past [plaintiff] to enter the field, [plaintiff] said something to [Tyler]' . . ., when in fact it is

24  undisputed that Sgt. Tyler initiated contact with [plaintiff] by saying, 'What's up?' . . . Sgt. Tyler

25  later reviewed Sgt. Carrillo's report . . ., but Sgt. Tyler did not make any effort to correct Sgt.

26  Carrillo's report, let alone stop the arrest or prosecution of [plaintiff].").)  Defendant Tyler "stated

27  that he wanted [plaintiff] arrested for the threats," and based on defendant Tyler's statement,

28  Sergeant Carrillo completed an information and belief ("I&B") for plaintiff's arrest.  (Ex. D,

1  Tyler Decl., Doc. No. 42-2 at 14 ("Based on Tyler's statement, I also believe that [plaintiff] was

2  attempting to dissuade Tyler from carrying out any official law enforcement duties that he

3  believed that Tyler may have that stemmed from [plaintiff's] arrest three months ago.").)

4  Sergeant Carrillo then "advised OPD Detectives and [MPD] of this report and that [he] had

5  completed an I&B and bail enhancement affidavit/order for [plaintiff's] arrest." (*Id.*)

6         Although OPD issued the I&B for plaintiff's arrest, MPD officers carried out the arrest of

7  plaintiff at his home that evening without incident. (*See* Ex. I, Rosenfeld Decl., Doc. No. 43-9

8  (MPD police report).)  Following the arrest, OPD Officer Andrew Stever was notified by MPD

9  that plaintiff was arrested and in custody at MPD. (Ex. H, Rosenfeld Decl., Doc. No. 45-8 at 4.)

10  Officer Stever went to MPD, interviewed plaintiff, and contacted the on-call judge to obtain a bail

11  enhancement based on plaintiff's history of violence and threats against defendant Tyler. (*Id.*)

12  The judge granted the bail enhancement, and plaintiff was arrested and booked into the Stanislaus

13  County Jail. (*Id.*)

14         The day of plaintiff's arrest, defendant Seese received a command-staff email from

15  Captain Gundlach stating that OPD issued an I&B for plaintiff's arrest. (Ex. N, Seese Dep., Doc.

16  No. 45-12 at 9.)  Shortly thereafter, defendant Seese texted defendant Tyler and the following

17  exchange occurred:

18          Defendant Seese:  Looks like OPD will be issuing an I&B for
           [plaintiff's] arrest.  That[']s a good thing.  What did he say to you at
19          the game?

20          Defendant Tyler:  He thinks I set him up on his arrest in front of the
           pd, he called me a punk and that he was going to get me when he
21          see[]s me.  He said all in front of some of Oakdale Coaches as they
           came out of half time.  I talked to one [of] the assumed Coaches about
22          it, who saw it to get him tossed.  I left with time on the clock to avoid
           him.
23
           Defendant Seese:  Geez.  I didn't realize it was that serious.  Glad the
24          ball is rolling on this.  Did he get tossed?

25          Defendant Tyler:  He wanted to fight right then.  Not the time or the
           place.  All I could do is walk away.  I can not [sic] say I was not upset
26          when he actually threatened me.

27          Defendant Seese:  You did the right thing!

28  /////

11

1    Defendant Tyler:  I am not sure if he got tossed.  Assumed coaches
     means I am not sure he was a coach but followed the team out.  I
2    called him coach and he turned and we talked about it. . . .

3    (Ex. C, FAC, Doc. No. 21 at 32–34; *but see* Pl.'s MSJ, Doc. No. 43-1 at 14 ("Lt. Seese, who was

4    on duty on November 5, 2016 . . . gave Sgt. Tyler a heads up that same day that [plaintiff]'s arrest

5    was imminent, text messaging Tyler:  'Looks like OPD will be issuing an I&B for [plaintiff]'s

6    arrest.  That['s] a good thing . . .'").)[3]

7        Two weeks after this arrest of plaintiff, as an investigative lieutenant, defendant Seese was

8    reviewing rejection letters from the district attorney's office to see why certain cases were

9    rejected and the type of crime involved.  (Ex. B, Seese Dep., Doc. No. 42-5 at 121.)  As he was

10   reviewing the rejection letters, defendant Seese claims that he realized that if the district

11   attorney's office "decides not to file charges against [plaintiff]," MPD would not find out because

12   the rejection letter would be sent to OPD.  (*Id.*)  Accordingly, defendant Seese contacted an OPD

13   officer and asked if she would call or email defendant Seese if she received a rejection letter as to

14   plaintiff and that he would send it to defendant Tyler's chain of command.  (*Id.*)

15       Defendant Seese also stated that Captain Gundlach called him and explained that the

16   sheriff and city attorney's office were trying to serve plaintiff with a court protective order but

17   were unable to do so.  (*Id.* at 124.)  Captain Gundlach asked defendant Seese if his personnel

18   could serve the protective order, but defendant Seese expressed his concern about getting

19   involved in an enforcement action against plaintiff.  (*Id.* at 124–25.)  Nevertheless, defendant

20   Seese asked one of his sergeants to attempt to serve plaintiff with the protective order through his

21   lawyer in order to avoid any interaction with plaintiff.  (*Id.* at 125–26.)

22       The Stanislaus County District Attorney's office ultimately charged plaintiff with

23   violating California Penal Code §§ 69 (obstructing or resisting a police officer in performance of

---

24   [3]  Plaintiff concedes that defendant Seese "did not take any action regarding the incident between
25   Tyler and Plaintiff except for writing Tyler a text the next day only after he learned that OPD had
     issued an arrest warrant for Plaintiff's arrest."  (Pl.s' Responses Defs.' Statement of Undisputed
26   Facts, Doc. No. 45-1 ¶ 24.)  However, plaintiff argues that defendant Seese's inaction results in
     his liability, specifically because defendant Seese did not "tell Tyler to desist or even properly
27   question him, or to prevent Seese's own underlings in the MPD from carrying out [plaintiff]'s
     arrest on November 5, 2016 . . ."  (*See id.* ¶¶ 24–26 ("Rather, Seese's belated messages can and
28   should be read as an effort to generate cover copy and plausible deniability.").)

duties by use of threat or violence), 136.1 (intimidation of witnesses and victims), 140(a) (threatening witnesses and victims), and 422 (making criminal threats).  (Pl.'s MSJ, Doc. No. 43-1 at 15; *see generally* Ex. L, Rosenfeld Decl., Doc. No. 43-10 (preliminary hearing transcript).) At plaintiff's preliminary hearing conducted on October 23, 2017, the district attorney moved to present defendant Tyler as both the complaining witness and the investigating officer.  (*See id.* at 2–4.)  The following exchange occurred between the state court judge presiding at the preliminary hearing, the district attorney, and plaintiff's counsel:

> [DISTRICT ATTORNEY]:  Further, I'm making a motion that detective – or [defendant] Tyler, who is the complaining witness in this case, would also be my investigating officer for the remainder of the prelim.
>
> THE COURT:  And that – well, let me ask you this:  Did he write the report in the case?  Was he the investigator, or was it because he was the victim in the case that then he – someone else was the investigator?
>
> [DISTRICT ATTORNEY]:  Well, some –
>
> [PLAINTIFF'S COUNSEL]:  He never wrote anything.
>
> [DISTRICT ATTORNEY]:  Sergeant Carrillo had to write his report on his behalf.  It was basically, frankly, a regurgitation of [defendant] Tyler's recitation.  And even though he's a victim, alleged victim in the case, we've had officers who are 148,[4] 69 PC's, et cetera, still investigating officer, even when they're an alleged victim.  They usually write a report, which in this case he didn't.
>
> THE COURT:  It's a little bit of an interesting question that, quite frankly, I don't know the answer to as I sit here.  If it's permitted, then I'm fine with it . . .
>
> [DISTRICT ATTORNEY]:  I believe it is.
>
> THE COURT:  It's normally – anybody know what the law – anybody have any law to provide me on that?  I mean, I guess I – I mean, the parties I think can pick whoever they want.
>
> [DISTRICT ATTORNEY]:  It is a police officer and he –
>
> THE COURT:  Well, he certainly would qualify in any other circumstances.  The only issue that I'm having is that he's the alleged victim in the case.
>
> [DISTRICT ATTORNEY]:  What if it was –

---

[4]  *See* Cal. Penal Code § 148 (resisting, delaying, or obstructing a police officer in the discharge of official duties).

1    THE COURT:  Here's what I'm going to do.  Is he going to be your
     first witness?

2
     [DISTRICT ATTORNEY]:  Yes.

3
     THE COURT:  Let's just hear his testimony over lunch.  I'm going
4    to allow that, unless one of you finds some law that says I'm not
     supposed to allow it, okay?

5
     So, [to plaintiff's counsel], over lunch, if you find something that
6    says he can't be the investigator, you let me know.  That's how it's
     going to end.  That's how we're going to do it.  Because I don't know
7    anything off the top of my head that says he can't.

8    [PLAINTIFF'S COUNSEL]:  I don't know anything either, but it
     seems highly unusual, and I have no report from him, and he's going
9    to sit here and listen to –

10   THE COURT:  If there's no law, then – he clearly qualifies as an
     investigator.  So if there's no law that says the victim can't be the
11   investigator, you guys can tell me over the lunch, all right?  There
     will be plenty of time.  We might as well hear his testimony.
12   Regardless, we're going to hear it.  So I'll just hold off.  Like I said,
     I gave you my tentative.  My tentative is I'm going to allow it unless
13   there's some law saying I can't.  And let's just get going, okay?  Are
     we ready?

14

15   (*Id.*)  At the conclusion of the preliminary hearing, the state court dismissed the charges brought

16   against plaintiff for violating Penal Code §§ 69 and 136.1.  (*See id.* at 14 (finding that the § 69

17   charge was inapplicable because defendant Tyler "wasn't on duty at the time"); Ex. B, Defs.'

18   RJN, Doc. No. 42-6 at 22.)  Defendant Tyler also requested that a stay-away order be issued to

19   plaintiff at the preliminary hearing, which the state court granted.  (*See* Ex. L, Rosenfeld Decl.,

20   Doc. No. 43-10 at 16–23.)

21         Plaintiff's counsel subsequently filed a motion to set aside the information pursuant to

22   California Penal Code § 995, seeking dismissal of the Penal Code §§ 140(a) and 422 charges on

23   grounds that plaintiff was held without probable cause.  (*See* Ex. A, Defs.' RJN, Doc. No. 42-6

24   (hearing transcript on motion to set aside information).)  A hearing was held on that motion on

25   December 7, 2017, and after hearing arguments from both sides, the state court judge determined

26   that there was sufficient evidence to try plaintiff for violating Penal Code § 422, but not for

27   violating § 140(a).  (*Id.*)  However, on the day of the scheduled jury trial on the charge of

28   /////

                                              14

1    violating Penal Code § 422, the district attorney dismissed that remaining charge and the criminal

2    case against plaintiff in its entirety.  (*See* Ex. O, Cherry Dep., Doc. No. 43-13 at 21.)

3         In moving for summary judgment, defendants assert that after the football game,

4    defendant Tyler "did not arrest Plaintiff, draft or submit a[] MPD police report to have Plaintiff

5    arrested, nor file a judicial application to have Plaintiff arrested or an arrest warrant issued, nor

6    call MPD or OPD as back up to help him arrest Plaintiff."  (Pl.'s Response Defs.' Statement of

7    Undisputed Facts, Doc. No. 45-1 ¶ 10.)  Plaintiff disputes this assertion, contending that "Tyler

8    caused [plaintiff]'s arrest, including by falsely reporting the events of November 4, 2016 to

9    [defendant] Seese and stating that he planned to get [plaintiff] arrested; falsely reporting the

10   events to MPD Captain Craig Gundlach; falsely reporting the events to OPD Sgt. Joseph Carrillo

11   and asking Carrillo to arrest [plaintiff]; and reviewing and failing to correct Carrillo's report."

12   (*Id.*)  Plaintiff further argues:

> There is no logical or legal basis for crediting defendants' self-
> serving explanations and justifications after the fact for their false
> arrest of [plaintiff], in light of their retaliatory arrest of [plaintiff] on
> June 9, 2016, and their myriad [of] lies and distortions of both that
> and the events of November 4, 2016, including particularly the
> MPD's false, distorted, and antagonistic criminal information
> bulletins about [plaintiff]; Tyler's provocation of [plaintiff] on
> 11/4/16 and false reporting of events; Tyler's actual knowledge that
> [plaintiff] did not threaten Tyler; and Tyler's and Seese's calculated
> "plan" to use the events of 11/4/16 as a false pretext to arrest and
> prosecute [plaintiff] (on what could have been a felony strike).  In
> light of this, there is no logical or legal basis for believing that
> [Captain Gundlach or Sergeant Carrillo] [were], or [were] capable of
> being, unbiased, let alone accurately informed.

21   (*Id.* at ¶ 15.)

22   **B.    Procedural History**

23        On September 14, 2018, plaintiff filed his original complaint in this action, asserting five

24   federal and five state law causes of action.  (Doc. No. 1.)  Defendants subsequently moved to

25   dismiss the complaint on December 21, 2018, on grounds that:  (1) plaintiff had failed to plead

26   with sufficient particularity that defendants acted color of state law; (2) plaintiff failed to state a

27   claim for conspiracy; (3) defendants are entitled to qualified immunity; (4) plaintiff's failure to

28   intervene claim is not permitted in a case not involving a claim of the excessive use of force; and

15

1  (5) plaintiff's state law claims must be dismissed pursuant to the California Tort Claims Act

2  ("CTCA").  (*See generally* Doc. No. 8.)

3         On March 6, 2019, the court issued an order granting in part and denying in part

4  defendants' motion to dismiss, and plaintiff was granted leave to amend to attempt to cure any

5  pleading deficiencies noted by the court in its order.  (Doc. No. 17.)  Specifically, the court

6  dismissed plaintiff's conspiracy claim brought pursuant to 42 U.S.C. § 1985 and plaintiff's state

7  law claims as barred by the CTCA.  (*See id.* at 12–17, 20–26.)  Otherwise, defendants' motion to

8  dismiss was denied.

9         On March 30, 2019, plaintiff filed his first amended complaint ("FAC").  (Doc. No. 21.)

10  Therein, his five federal causes of action (Claims I, II, III, IV, and V) are brought pursuant to 42

11  U.S.C. § 1983 ("§ 1983") and are asserted against defendants Tyler and Seese in their individual

12  capacities:  (1) unreasonable search, seizure, arrest, detention and/or imprisonment in violation of

13  the Fourth Amendment; (2) retaliation for, and interference with, free speech in violation of the

14  First Amendment; (3) failure to intervene; (4) deprivations of procedural and substantive due

15  process (deliberate fabrication of evidence and interference with access to justice) in violation of

16  the Fourteenth Amendment; and (5) conspiracy.[5]  (*See id.* at 12–18.)

17                              **LEGAL STANDARD**

18         Summary judgment is appropriate when the moving party "shows that there is no genuine

19  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

20  Civ. P. 56(a).

21         In summary judgment practice, the moving party "initially bears the burden of proving the

22  absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

23  (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

24

25  [5]  In the original complaint, plaintiff asserted his federal causes of action against defendants Tyler
    and Seese in their official capacities.  (*Compare* Doc. No. 1 at 12–20 (one exception being that

26  the conspiracy cause of action was previously asserted against defendant Tyler in both his
    individual and official capacities), *with* FAC, Doc. No. 21 at 12–18.)  As for his five state law

27  causes of action (Claims VI, VII, VIII, IX, and X), the FAC notes that plaintiff is repleading those
    causes of action, "mindful of the Court's dismissal of these claims without prejudice . . ., only to

28  preserve any appeal rights . . ."  (FAC, Doc. No. 21 at 1 n.1.)

1   may accomplish this by "citing to particular parts of materials in the record, including

2   depositions, documents, electronically stored information, affidavits or declarations, stipulations

3   (including those made for purposes of the motion only), admissions, interrogatory answers, or

4   other materials" or by showing that such materials "do not establish the absence or presence of a

5   genuine dispute, or that the adverse party cannot produce admissible evidence to support the

6   fact." Fed. R. Civ. P. 56(c)(1)(A), (B).  If the moving party meets its initial responsibility, the

7   burden then shifts to the opposing party to establish that a genuine issue as to any material fact

8   actually does exist.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

9   (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

10  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

11  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

12  contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11;

13  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider

14  admissible evidence in ruling on a motion for summary judgment.").  The opposing party must

15  demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

16  suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W.*

17  *Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the

18  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

19  nonmoving party.  *See Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

20      In the endeavor to establish the existence of such a factual dispute, the opposing party

21  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

22  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

23  versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary

24  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

25  genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

26      "In evaluating the evidence to determine whether there is a genuine issue of fact," the

27  court draws "all reasonable inferences supported by the evidence in favor of the non-moving

28  party." *Walls v. Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is

the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–55 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Undisputed facts are taken as true for purposes of a motion for summary judgment. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745 (9th Cir. 2010). To demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## ANALYSIS

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "To succeed on a § 1983 claim, a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011) (citation omitted); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–95 (1978) (defining "person" to include municipalities); *Rizzo v. Goode*, 423 U.S. 362, 370–71 (1976) (imposing liability "only for conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws.").

"Acting under color of state law is 'a jurisdictional requisite for a § 1983 action." *Gritchen v. Collier*, 254 F.3d 807, 812 (9th Cir. 2001) (quoting *West v. Atkins*, 487 U.S. 42, 46 (1988)). "[W]hether a[n] . . . officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Anderson v. Warner*, 451 F.3d 1063, 1068 (9th Cir. 2006) (internal quotation marks and citations omitted) (alterations in original). "It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State.
/////

18

1  Thus, generally, a public employee acts under color of state law while acting in his official

2  capacity or while exercising his responsibilities pursuant to state law." *West*, 487 U.S. at 49–50.

3         On May 8, 2020, defendants moved for summary judgment or, in the alternative summary

4  adjudication, in their favor, contending that:  (1) defendant Tyler did not act under color of state

5  law because he acted in his personal capacity when he reported plaintiff's threats against him to

6  the police; (2) defendant Seese did not act under color of state law or take any action that caused

7  plaintiff's arrest; (3) defendant Tyler did not act under color of state law through "joint action"

8  with the state; (4) defendant Tyler did not conspire with defendant Seese or any other individual

9  to have plaintiff falsely arrested; (5) plaintiff's failure to intervene claim fails as a matter of law;

10  and (6) plaintiff's state claims have been dismissed.  (Doc. No. 42 at 3–4.)

11         On the same day, plaintiff moved for partial summary judgment or summary adjudication

12  in his favor, arguing that:  (1) defendants Tyler and Seese were acting under color of state law;

13  (2) "to the extent defendants are deemed private citizens who acted as state actors, qualified

14  immunity is unavailable to them"; and (3) plaintiff is entitled to summary judgment in his favor

15  as to his unlawful arrest cause of action brought under the Fourth Amendment because there was

16  no probable cause to arrest him.  (*See* Doc. No. 43-1 at 18–27.)  The cross-motions for summary

17  judgment have each been fully briefed.[6]  (Doc. Nos. 45–49.)

18         The court will first address defendants' motion for summary judgment, beginning with, in

19  light of the evidence before the court on summary judgment, whether there is a triable issue of

20  fact as to whether defendants Tyler and Seese were acting under color of state law.

21  **A.     Defendants' Motion for Summary Judgment**

22         1.     Defendants' Request for Judicial Notice

23         Defendants request that the court take judicial notice of:  (1) the transcript of the

24  December 7, 2017 hearing and ruling on a motion to set aside the information in *People v.*

25  *Cherry*, Stanislaus Superior Court Case No. 4001990; (2) the minute order issued on December 7,

26  _____

27  [6]  Plaintiff filed corrected versions of his opposition brief to defendants' motion for summary
    judgment and his reply brief in support of his own motion for summary judgment.  (*See* Doc.

28  Nos. 46 at 1 n.1 & 49 at 1 n.1 (requesting that these corrected briefs be read and considered in
    lieu of the original briefs filed but together with other papers filed in support of those briefs).)

1    2017 in *People v. Cherry*, Stanislaus Superior Court Case No. 4001990; and (3) the court docket

2    from and minute order issued on July 24, 2001 in *People v. Cherry*, Stanislaus Superior Court

3    Case No. 10162481.  (*See* Doc. No. 42-6.)  Plaintiff has not objected to defendants' request in this

4    regard.

5            A court may "judicially notice a fact that is not subject to reasonable dispute because it:

6    (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

7    readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R.

8    Evid. 201(b).  The court may also take judicial notice of matters of public record.  *Lee v. City of*

9    *L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001).  When a court takes judicial notice of a document, "it

10   may do so not for the truth of the facts recited therein, but for the existence of the [record], which

11   is not subject to reasonable dispute over its authenticity."  *Id.* at 690 (internal quotation marks and

12   citation omitted).  Here, the court will take judicial notice of the documents from the court files of

13   the underlying state court criminal prosecutions of plaintiff.  *See Lininger v. Pfleger*, No. 17-cv-

14   03385, 2017 WL 5128170, at *1 n.1 (N.D. Cal. Nov. 6, 2017) ("The documents submitted for

15   judicial notice are documents filed in Plaintiff's state court criminal proceedings, which are

16   suitable for judicial notice under Fed. R. Evid. 201(b).") (citing *Dawson v. Mahoney*, 451 F.3d

17   550, 551 (9th Cir. 2006)).

18           2.    Whether Defendant Tyler Was Acting Under Color of State Law

19           One question here is whether defendant Tyler committed the alleged deprivation of

20   plaintiff's constitutional rights while acting under color of law.  *See Hyun Ju Park v. City and*

21   *Cnty. of Honolulu*, 952 F.3d 1136, 1140 (9th Cir. 2020).  In determining whether an *off-duty*

22   employee was acting under color of state law, "there are three critical requirements that must be

23   satisfied":

24               First, the defendant's action must have been performed while the
                 officer is acting, purporting, or pretending to act in the performance
25               of his or her official duties.  Second, the officer's pretense of acting
                 in the performance of his duties must have had the purpose and effect
26               of influencing the behavior of others.  Third, the challenged conduct
                 must be related in some meaningful way either to the officer's
27               governmental status or to the performance of his duties.

28   /////

                                        20

1  *Anderson*, 451 F.3d at 1068–69 (internal quotation marks and citations omitted); *see also Hyun Ju*

2  *Park*, 952 F.3d at 1140 ("Our circuit has developed a three-part test for determining when a

3  police officer, although not on duty, has acted under color of state law."). "Officers who engage

4  in confrontations for personal reasons unrelated to law enforcement, and do not purport or pretend

5  to be officers, do not act under color of law." *Huffman v. Cnty. of L.A.*, 147 F.3d 1054, 1058 (9th

6  Cir. 1998) (internal quotation marks, alterations, and citations omitted). Likewise, "acts of

7  officers in the ambit of their personal pursuits are plainly excluded . . . [from] the words 'under

8  color of any law.'" *Screws v. United States*, 325 U.S. 91, 111 (1945); *see also Naffe v. Frey*, 789

9  F.3d 1030, 1037 (9th Cir. 2015) ("On the other hand, a government employee does not act under

10  color of state law when he pursues private goals via private actions."). Alternatively, "a private

11  party who 'is a willful participant in joint action with the State or its agents'" may be liable under

12  § 1983. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); *see also DeGrassi v. City of*

13  *Glendora*, 207 F.3d 636, 647 (9th Cir. 2000) ("Private persons, jointly engaged with state

14  officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions.")

15  (quoting *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980)).

16        With respect to the first requirement, viewing the evidence in a light most favorable to

17  plaintiff, the court finds there is a triable issue of fact as to whether defendant Tyler was acting,

18  purporting, or pretending to act in the performance of his official duties. Defendants contend that

19  the undisputed evidence before the court on summary judgment establishes that defendant Tyler

20  was not acting under color of state law because he "did not report Plaintiff's criminal threat to the

21  police – which is the allegedly wrongful conduct – while acting, purporting, or pretending to

22  carry out Tyler's official law enforcement duties[.]" (Defs.' MSJ, Doc. No. 42 at 22.) It is

23  undisputed that defendant Tyler was off duty during the football game and when he spoke to

24  Captain Gundlach and Sergeant Carrillo the following day. (Pl.'s Response Defs.' Statement of

25  Undisputed Facts, Doc. No. 45-1 ¶¶ 1, 15; *see also* Pl.'s MSJ, Doc. No. 43-1 at 6, 20 (stating that

26  defendant Tyler was off duty on November 4 and 5, 2016).) The undisputed evidence also shows

27  that defendant Tyler did not arrest, detain, or interview plaintiff on November 4 and 5, 2016. (*See*

28  Ex. I, Rosenfeld Decl., Doc. No. 43-9 (MPD police report detailing the arrest of plaintiff); Ex. H,

1   Rosenfeld Decl., Doc. No. 45-8 at 4 (OPD police report completed by Sergeant Carrillo and

2   Officer Stever).)  What is also undisputed, however, is that, during the prosecution of plaintiff

3   following his arrest, defendant Tyler was presented by a Stanislaus County Deputy District

4   Attorney and accepted by a Stanislaus County Superior Court Judge as both the complaining

5   witness and the *investigating officer* at plaintiff's preliminary hearing.  (*See* Ex. L, Rosenfeld

6   Decl., ECF No. 43-10 at 2–4.)

7        Defendants contend that "the [district attorney's] request to have Tyler sit next to him

8   during Plaintiff's preliminary hearing says nothing about whether Tyler reported Plaintiff's

9   threats in his personal capacity versus official capacity." (Defs.' Reply ISO MSJ, Doc. No. 48 at

10  12.)  Instead, defendants assert that "[t]he parties and the Superior Court acknowledged that Tyler

11  was the victim, regardless, and in any event the preliminary hearing occurred well after Tyler had

12  reported Plaintiff's threats to the police, which is the challenged conduct that Plaintiff[] asserts

13  constituted state action, not Plaintiff's ensuing prosecution." (*Id.*)  The relevant color of law

14  inquiry, however, is whether defendant Tyler committed the alleged deprivation of plaintiff's

15  constitutional rights while acting under color of law.  *See Hyun Ju Park*, 952 F.3d at 1140.  In this

16  case, the alleged deprivation not only stems from defendant Tyler's reporting of plaintiff's

17  alleged threat but also the subsequent prosecution of plaintiff, for without defendant Tyler's

18  reporting, plaintiff would not have been arrested and prosecuted for those alleged threats.[7]

19        Defendants rely on a number of cases for the proposition that "the filing of a criminal

20  complaint by a police officer is the act of a private citizen, not an act of the state." (Defs.' MSJ,

21  Doc. No. 42 at 22.)  Even so, those cases are distinguishable because those police officers did not

22  take any action other than filing a criminal complaint or report, whereas here, defendant Tyler

23  _____

24  [7]  At the preliminary hearing, in moving to make defendant Tyler the investigating officer, the
    district attorney noted that in cases alleging violations of California Penal Code §§ 69 and 148,

25  the police officers would be considered both the victim and investigating officer.  (Ex. L,
    Rosenfeld Decl., Doc. No. 43-10 at 3.)  However, those specific Penal Code sections involve

26  obstructing or resisting police officers *in the performance or discharge of their official duties*.
    *See* Cal. Penal Code §§ 69, 148.  The fact that defendant Tyler was off duty and allegedly not

27  acting in the performance of his official duties but nonetheless recognized as the investigating
    officer at the preliminary hearing creates a triable issue of fact as to whether defendant Tyler was

28  acting under color of law.

1   was presented and accepted as the investigating officer in plaintiff's prosecution at the

2   preliminary hearing.[8]  *Cf. Barnes v. City of Centralia, Ill.*, 943 F.3d 826, 831 (7th Cir. 2019)

3   (noting that the complaining officer was not contacted by the assistant state attorney during the

4   prosecution); *Smith v. Avent*, No. 98 C 4389, 1999 WL 33891, at *1–3 (N.D. Ill. Jan. 15, 1999)

5   (stating that the police officer only filed a criminal complaint for telephone harassment and that

6   her conduct was limited "simply [to] that of a complaining witness"); *Redding v. St. Eward*, 241

7   F.3d 530, 533 (6th Cir. 2001) (finding the off-duty police officer did not act under color of law

8   when she made 911 calls and reports to the responding officers); *Apata v. Howard*, Civil Action

9   No. 05-3204 (JEI), 2009 WL 29314, at *4 (D.N.J. Jan. 6, 2009) (finding the police officer only

10  filed an affidavit "in the same fashion as would any member of the public").  Ultimately, the fact

11  that defendant Tyler served as the investigating officer in the prosecution of plaintiff that is at

12  issue in this civil rights action is sufficient to raise a triable issue of fact as to whether defendant

13  Tyler was acting or purporting to act in the performance of his official duties.

14         As to the second and third requirements, the court also finds triable issues of fact as to

15  whether defendant Tyler's actions taken in the performance of his duties had the purpose and

16  effect of influencing others and whether the challenged conduct is related in some meaningful

17  way to defendant Tyler's government status or performance of his duties.  A review of the

18  underlying police report shows that Sergeant Carrillo merely adopted defendant Tyler's statement

19  as his report and issued the I&B based solely on defendant Tyler's statement.  (*See* Ex. D, Tyler

20  Decl., Doc. No. 42-2 at 13–14 ("Based on Tyler's statement, I also believe that [plaintiff] was

21  attempting to dissuade Tyler from carrying out any official law enforcement duties that he

22  believed that Tyler may have that stemmed from [plaintiff's] arrest three months ago."); Defs.'

23  MSJ, Doc. No. 42 at 24 ("[T]here is no evidence to suggest that Sergeant Carrillo issued the I&B

24  based on anything beyond his own independent professional judgment and conclusion that the

25

26  [8]  Indeed, as the deputy district attorney prosecuting plaintiff in the Stanislaus County Superior
    Court told the judge presiding at plaintiff's preliminary examination, defendant Tyler essentially
27  wrote the police report leading to plaintiff's arrest since Sergeant Carrillo of OPD merely
    "regurgitat[ed] . . . Tyler's recitation" of the events.  (*See* Ex. L, Rosenfeld Decl., ECF No. 43-10
28  at 3.)

23

1    facts he collected supported probable cause.").)  Additionally, defendant Tyler, not Sergeant

2    Carrillo, was presented by the district attorney and accepted by the Stanislaus County Superior

3    Court as the investigating officer during the prosecution of plaintiff at issue in this action.  (*See*

4    Ex. L, Rosenfeld Decl., ECF No. 43-10 at 3 ("Sergeant Carrillo had to write his report on

5    [defendant Tyler's] behalf.  It was basically, frankly, a regurgitation of [defendant] Tyler's

6    recitation.").)  From the evidence presented on summary judgment that defendant Tyler was

7    recognized as the investigating officer, and that his account of events solely led to plaintiff's

8    arrest and subsequent prosecution, a reasonable jury could find that defendant Tyler played a

9    greater role in plaintiff's arrest and prosecution than simply that of a complaining witness.

10           For the reasons set forth above, the court finds that based upon the evidence submitted, all

11   three *Anderson* requirements are satisfied and that there are triable issues of fact as to whether

12   defendant Tyler acted under color of law.  Accordingly, defendants' motion for summary

13   judgment on this ground is DENIED.

14           3.      Whether Defendant Seese Took Any Action Causing Plaintiff's Arrest

15           "A person 'subjects' another to the deprivation of a constitutional right, within the

16   meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or

17   omits to perform an act which he is legally required to do that causes the deprivation of which

18   complaint is made."  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978); *see also Hydrick v.*

19   *Hunter*, 500 F.3d 978, 988 (9th Cir. 2007).  "An officer can be held liable for a constitutional

20   violation only when there is a showing of 'integral participation' or 'personal involvement' in the

21   unlawful conduct, as opposed to mere presence at the scene."  *Bonivert v. City of Clarkston*, 883

22   F.3d 865, 879 (9th Cir. 2018) (citing *Jones v. Williams*, 297 F.3d 930, 935–36 (9th Cir. 2002)).

23   The "requisite causal connection can be established not only by some kind of direct personal

24   participation in the deprivation, but also by setting in motion a series of acts by others which the

25   actor knows or reasonably should know would cause others to inflict the constitutional injury."

26   *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) (quoting *Johnson*, 588 F.2d at 743–44);

27   *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012) (*en banc*).  Likewise, liability can be

28   based upon a defendant's integral participation, which "does not require that each officer's

1    actions themselves rise to the level of a constitutional violation."  *Boyd v. Benton Cnty.*, 374 F.3d

2    773, 780 (9th Cir. 2004); *see also Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009).

3    Under the integral participation doctrine, all that is required is "some fundamental involvement in

4    the conduct that allegedly caused the violation."  *Blankenhorn v. City of Orange*, 485 F.3d 463,

5    481 n.12 (9th Cir. 2007).  Nonetheless, under this theory, liability does not attach to "a mere

6    bystander" who had "no role in the unlawful conduct."  *Chuman v. Wright*, 76 F.3d 292, 294–95

7    (9th Cir. 1996).

8         A supervisor may be held individually liable under § 1983 "only if there exists either (1)

9    his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal

10   connection between the supervisor's wrongful conduct and the constitutional deprivation."

11   *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018) (internal quotations and citation

12   omitted).  In his or her individual capacity, a supervisor may be liable for (1) his or her own

13   culpable action or inaction in the training, supervision, or control of his or her subordinates; (2)

14   for his or her acquiescence in the constitutional deprivation; or (3) for conduct that shows a

15   deliberate indifference to the rights of others.  *Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 798 (9th

16   Cir. 2018).  Thus, an officer acting as a supervisor cannot be held liable on a theory of vicarious

17   liability.  *Hansen v. Black*, 885 F.2d 642, 645–46 (9th Cir. 1989); *see also Crowley v. Bannister*,

18   734 F.3d 967, 977 (9th Cir. 2013) ("Under Section 1983, supervisory officials are not liable for

19   actions of subordinates on any theory of vicarious liability.") (quoting *Snow v. McDaniel*, 681

20   F.3d 978 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th

21   Cir. 2014)).  However, "a supervisor is liable for the acts of his subordinates 'if the supervisor

22   participated in or directed the violations, or knew of the violations [of subordinates] and failed to

23   act to prevent them.'"  *Preschooler II v. Clark Cnty. Sch. Bd. of Tr.*, 479 F.3d 1175 (9th Cir.

24   2007) (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)).

25        Here, in moving for summary judgment defendants assert that "Seese did not arrest,

26   detain, or search Plaintiff, nor contact OPD about arresting Plaintiff[,]" and thus the evidence

27   establishes that defendant Seese had no involvement in plaintiff's arrest.  (Defs.' MSJ, Doc. No.

28   42 at 28.)  Defendants also argue that defendant Seese "had no obligation to act concerning

25

Tyler's incident with Plaintiff at the football game or Tyler's text message about it to Seese" because "Seese was not Tyler's supervisor, he was off-duty watching a game, and had scant information about the incident." (*Id.* at 29.)

Plaintiff does not dispute that defendant Seese "did not take any action regarding the incident between Tyler and Plaintiff except for writing Tyler a text the next day only after he learned that OPD had issued an arrest warrant for Plaintiff's arrest." (*See* Pl.'s Responses Defs.' Statement of Undisputed Facts, Doc. No. 45-1 ¶¶ 24.)  Nevertheless, plaintiff contends that defendant Seese may be found liable because he "ordered Tyler to arrest [plaintiff on November 4, 2016]; did not question or contradict the plan to get OPD to issue the I&B for [plaintiff's] arrest; and did not take any action to prevent Seese's own underlings in the MPD from carrying out [plaintiff's] physical arrest on November 5, 2016." (*See id.* ¶¶ 24–26; Pl.'s Opp'n Defs.' MSJ, Doc. No. 46 at 26–28.)  In other words, plaintiff opposes summary judgment on the ground that defendant Seese was aware of defendant Tyler's plan to have plaintiff falsely arrested but did nothing to prevent plaintiff's arrest from taking place. (*Id.* at 28.)

"[P]olice officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).  "[O]fficers can be held liable for failing to intercede only if they had an opportunity to intercede." *Id.*  While "[s]uch liability generally has been limited to the excessive force context," some courts have "suggest[ed] that liability for failure to intercede may extend beyond excessive force cases to other constitutional violations, such as violation of due process rights." *Rubalcava v. City of San Jose*, Case No. 20-cv-04191-BLF, 2021 WL 2987164, at *10 (N.D. Cal. July 15, 2021) (citing *Lu Huang v. Cnty. of Alameda*, No. C11-01984 TEH, 2011 WL 5024641, at *3 (N.D. Cal. Oct. 20, 2011)).  Regardless, the evidence presented to the court on summary judgment in this case establishes that defendant Seese did not participate in any actions leading to plaintiff's arrest.

Based upon the evidence before the court on summary judgment, it is undisputed that defendant Seese did not:  (1) contact OPD on behalf of defendant Tyler; (2) take defendant Tyler's statement; (3) issue the I&B for plaintiff's arrest; (4) arrest, detain, or search plaintiff; or

1    (5) order MPD officers to arrest plaintiff.  (*See* Pl.'s Responses Defs.' Statement of Undisputed

2    Facts, Doc. No. 45-1 ¶¶ 24.)  The undisputed evidence demonstrates that aside from texting

3    defendant Tyler, defendant Seese did not take any action, official or otherwise, leading to

4    plaintiff's arrest and only learned about OPD issuing the I&B from a command-staff email sent

5    by Captain Gundlach after the I&B had already been issued.  (Ex. N, Seese Dep., Doc. No. 45-12

6    at 9.)  Even under a failure to intercede theory, there is no evidence suggesting that defendant

7    Seese had an opportunity to intercede to prevent plaintiff's arrest because he did not know about

8    the I&B until after it was issued, and the I&B was issued by a different police department.  After

9    receiving the email from Captain Gundlach, defendant Seese then texted defendant Tyler to ask

10   what had happened with plaintiff at the football game and responded merely that he "didn't

11   realize it was that serious."  (Ex. C, FAC, Doc. No. 21 at 32–34.)  Accordingly, there is no

12   evidence before the court on summary judgment that defendant Seese took any action, either

13   direct or indirect, leading to plaintiff's arrest or that he should have or could have interceded to

14   prevent it.

15             4.      Whether Plaintiff's Failure to Intervene Claim Fails as a Matter of Law

16             On its face, plaintiff's complaint asserts a failure to intervene claim against both

17   defendants Tyler and Seese.  (FAC, Doc. No. 21 at 16.)  Defendants seek dismissal of plaintiff's

18   entire failure to intervene claim "for the separate and independent reason that such a claim is only

19   cognizable in an excessive force context which is not at issue here."  (*See* Defs.' MSJ, Doc. No.

20   42 at 31–32.)

21             As mentioned above, while the duty to intervene has generally been applied in excessive

22   use of force cases, it cannot be said that as a matter of law, a cognizable failure to intervene claim

23   can *only* be stated in the excessive use of force context.  *See Cunningham*, 229 F.3d at 1289

24   ("[P]olice officers have a duty to intercede when their fellow officers violate the *constitutional*

25   *rights* of a suspect or other citizen.") (emphasis added); *Lu Huang*, 2011 WL 5024641, at *3

26   (applying a duty to intercede in case alleging due process violations); *Alexander v. CIM Chino*

27   *Prison*, Case No. CV 19-1332-VBF (SP), 2021 WL 6104229, at *6–7 (C.D. Cal. Mar. 22, 2021)

28   (collecting cases and finding that "the duty to intercede is not limited to excessive force claims").

1    Accordingly, defendants' motion for summary judgment in their favor on plaintiff's failure to

2    intervene claim on this basis will be DENIED.[9]

3          5.     Whether Plaintiff's Conspiracy Claim Fails

4          "A civil conspiracy is a combination of two or more persons who, by some concerted

5    action, intend to accomplish some unlawful objective for the purpose of harming another which

6    results in damage." *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (quoting

7    *Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d 1330, 1343 (9th Cir. 1990)).  To succeed on a

8    conspiracy claim under § 1983, a plaintiff must show that the defendants had "an agreement or

9    'meeting of the minds' to violate plaintiff's constitutional rights." *Franklin v. Fox*, 312 F.3d 423,

10   441 (9th Cir. 2002) (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539,

11   1540–41 (9th Cir. 1989)).  "To be liable, each participant in the conspiracy need not know the

12   exact details of the plan, but each participant must at least share the common objective of the

13   conspiracy." *Franklin*, 312 F.3d at 441 (quoting *United Steelworkers*, 865 F.2d at 1541).

14         "Conspiracy is not itself a constitutional tort under § 1983," for "[i]t does not enlarge the

15   nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional

16   violation." *Lacey*, 693 F.3d at 935.  However, conspiracy may "enlarge the pool of responsible

17   defendants by demonstrating their causal connections to the violation; the fact of the conspiracy

18   may make a party liable for the unconstitutional actions of the party with whom he has

19   conspired." *Id.* at 934–35 & n.19 (stating that "conspiracy is not an independent claim for relief,

20   but helps to connect the actions of multiple defendants . . .").  "Conspiracy in § 1983 actions is

21   usually alleged by plaintiffs to draw in private parties who would otherwise not be susceptible to

22

23   _____

     [9]  The parties do not appear to have grappled fully with the unusual situation presented by

24   plaintiff's remaining claims in this case.  Specifically, it is unclear whether it is legally
     permissible to simultaneously maintain claims that:  (1) defendant Tyler acted under color of state

25   law to make false statements that resulted in the false arrest and prosecution of plaintiff; and
     (2) that defendant Tyler failed to intervene to prevent the false arrest and prosecution that he is

26   alleged to have set in motion.  *See Flores v. City of Concord*, No. 15-CV-05244-PJH, 2017 WL
     3641862, at *1 (N.D. Cal. Aug. 24, 2017) ("As to the 'failure to intervene' theory, plaintiff cannot

27   simultaneously allege that Officers Halm and Kindorf used excessive force and failed to intervene
     against themselves, or that Officer Halm both made the false arrest and failed to prevent himself

28   from doing so.").

a § 1983 action because of the state action doctrine, or to aid in proving claims against otherwise tenuously connected parties in a complex case." *Id.* at 935 (internal citations omitted).

Vague and conclusory allegations of a conspiracy with no supporting factual averments or evidence will not withstand an adequately supported motion for summary judgment. *Woodrum v. Woodward Cnty., Okla.*, 866 F.2d 1121, 1126 (9th Cir. 1989). Rather, to survive summary judgment on such a conspiracy claim, the plaintiff must come forward with evidence showing that a conspiracy existed. *See Taylor*, 880 F.2d at 1045. However, "[s]uch an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the action of the defendants." *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301–02 (9th Cir. 1999) ("Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action."). "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Id.* at 1301 (citation and internal quotation marks omitted).

Here, in his FAC plaintiff alleges that "[d]efendants Tyler and Seese acted in concert to violate Plaintiff's federal civil rights, namely" those under the First and Fourth Amendments. (FAC, Doc. No. 21 ¶¶ 85–86.) Defendants move for summary judgment in their favor as to plaintiff's conspiracy claim on grounds that "there are no facts to suggest that Tyler and Seese (or any other individual for that matter) had an agreement to violate Plaintiff's constitutional rights" or "that Seese had the requisite agreement to falsely arrest Plaintiff."[10] (Defs.' MSJ, Doc. No. 42 at 31 ("For example, there is no evidence that Seese knew that Plaintiff had not actually

/////

---

[10] Both plaintiff and defendants' arguments as to plaintiff's conspiracy claim are largely derivative of their arguments as to whether defendant Seese took any action in connection with plaintiff's arrest. (*See* Defs.' MSJ, Doc. No. 42 at 30–31; Pl.'s Opp'n Defs.' MSJ, Doc. No. 46 at 25–28.) Although defendant Seese did not take any direct action leading to plaintiff's arrest, he may still be liable as a defendant in this action under a conspiracy claim.

threatened Tyler, nor any evidence to suggest that Seese did not believe Tyler that Plaintiff had made the threats, yet took action to have Plaintiff arrested anyway.").)

Plaintiff points to evidence of the text messages exchanged between defendants Tyler and Seese at the football game as showing that defendant Seese was aware of a plan to falsely arrest plaintiff.  (*See* Pl.'s Opp'n Defs.' MSJ, Doc. No. 46 at 26–28 (contending that defendant Seese "either had a 'plan' with Tyler to get [plaintiff] arrested, or Tyler drew Seese into his plan by virtue of telegraphing it to Seese, who did not tell Tyler to stand down, or write a report, or even come see him.").)  Contrary to plaintiff's assertions, however, even viewing these text messages in a light most favorable to plaintiff, they do not suggest the existence of a coordinated or agreed-upon plan to *falsely* arrest plaintiff.  *See Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440–41 (9th Cir. 2010) ("The key inquiry is whether [the officer] shared a 'common objective' with the Escondido police officers to *falsely prosecute* the boys.  A 'common objective' to *merely prosecute* the boys is insufficient; fair prosecution would not violate the boys' constitutional rights.") (emphasis added).  Like defendant Tyler, defendant Seese was also off-duty while at the game watching his son play football.  (Pl.'s Responses Defs.' Statement of Undisputed Facts, Doc. No. 45-1 ¶ 18.)  Defendants Tyler and Seese had not directly communicated with each other for months prior to that date due to defendant Tyler's filing of an employment grievance against defendant Seese for racial discrimination.  (*Id.* ¶ 21; Ex. N, Seese Dep., Doc. No. 45-12 at 4.)  Defendant Seese's testimony that he was surprised to receive defendant Tyler's text message at the football game and that it was "out of the blue" is not refuted on summary judgment.  (Pl.'s Responses Defs.' Statement of Undisputed Facts, Doc. No. 45-1 ¶¶ 21–22; Ex. N, Seese Dep., Doc. No. 45-12 at 7.)

Nevertheless, plaintiff contends that defendant Seese texting defendant Tyler, "Arrest him," is equivalent to defendant Seese commanding or ordering defendant Tyler to arrest plaintiff without determining if there was sufficient probable cause to do so.  (Pl.'s Opp'n Defs.' MSJ, Doc. No. 46 at 26.)  However, defendant Seese subsequently responded to Tyler by text that he was merely joking when defendant Tyler texted, "That[']s the plan."  (Ex. D, Doc. No. 43-7 at 1.)  Defendant Tyler also texted that he would not make the arrest himself.  (*Id.*)  Additionally,

1   defendant Tyler testified that he did not consider or interpret defendant Seese's text to be an order

2   from his supervisor to arrest plaintiff, and that his "plan" that he referred to was to report the

3   alleged threat.  (Ex. A, Tyler Dep., Doc. No. 42-5 at 76–82.)  Even accepting plaintiff's version

4   that defendant Seese ordered defendant Tyler to arrest plaintiff, there is no evidence before the

5   court on summary judgment indicating that defendant Seese shared the common objective of

6   falsely arresting plaintiff.  *See Crowe*, 608 F.3d at 441 ("It is too great a leap to conclude that help

7   in obtaining a confession—even a coerced confession—suggests that [the officer] shared the

8   common objective of falsely prosecuting the boys.").

9          In addition, plaintiff contends that defendant "Tyler also conspired with [defendant]

10   Seese, Captain Gundlach, and other members of the [MPD] to get [plaintiff] based on its Criminal

11   Information Bulletins."  (Pl.'s Opp'n Defs.' MSJ, Doc. No. 46 at 19.)  However, these bulletins

12   were issued by the MPD to members of the department and there is no evidence to suggest that

13   defendant Tyler, defendant Seese, or Captain Gundlach had anything to do with their issuance or

14   content.  Furthermore, a bulletin issued to an entire police department cannot reasonably be used

15   to infer a conspiracy between two or three specific individuals.  Finally, even viewing the

16   evidence on summary judgment in a light most favorable to plaintiff, the bulletins do not suggest

17   any specific plan or agreement among the named defendants to have plaintiff falsely arrested.

18   (*See* Ex. A, Rosenfeld Decl., 43-4 ("Please develop your own PC [probable cause] for any subject

19   or vehicle stops.").)

20          For all of the reasons set forth above, the court finds that there has been insufficient

21   evidence presented to support a finding by a jury that defendants Tyler and Seese conspired to

22   falsely arrest plaintiff.  Therefore, defendants' motion for summary judgment with respect to

23   plaintiff's conspiracy claim will be GRANTED.

24   **B.     Plaintiff's Motion for Partial Summary Judgment**

25          Plaintiff contends in his own motion for partial summary judgment that defendants Tyler

26   and Seese were acting under color of state law at all relevant times.  (*See* Pl.'s MSJ, Doc. No. 43-

27   1 at 16–22.)  As outlined above, defendants are entitled to summary judgment as to any such

28   claim against defendant Seese because there has been no evidence presented on summary

judgment that would support a finding that defendant Seese participated in plaintiff's arrest or that he conspired to have plaintiff falsely arrested.  (*See supra* Parts A.3, A.5.)  However, above the court has concluded that there is a triable issue of fact as to whether defendant Tyler was acting under color of law.  (*See supra* Part A.2.)  Nonetheless, a reasonable jury could resolve that issue based upon the evidence either way, meaning that summary judgment is also precluded in plaintiff's favor on the issue of whether defendant Tyler was acting under color of law. Therefore, plaintiff's motion for summary judgment in his favor as to whether defendants Tyler and Seese were acting under color of law will be DENIED.  Accordingly, below the court will address the remaining contentions raised in plaintiff's motion, specifically whether summary judgment is warranted in plaintiff's favor as to his false arrest claim and whether defendants are entitled to qualified immunity.

      1.   <u>False Arrest</u>

    "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification."  *Dubner v. City & Cnty. of S.F.*, 266 F.3d 959, 964 (9th Cir. 2001); *see also Velazquez v. Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015).  "Probable cause exists when there is a fair probability or substantial chance of criminal activity."  *Velazquez*, 793 F.3d at 1018 (quoting *United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004)).  In order to prevail on such a claim, the plaintiff must "demonstrate that there was no probable cause to arrest him."  *Norse v. City of Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010) (quoting *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998)); *see also Harper v. City of L.A.*, 533 F.3d 1010, 1022 (9th Cir. 2008) ("An arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983.").

    Defendant argues that the state court's finding of probable cause at plaintiff's preliminary hearing has preclusive effect in this litigation.[11]  (*See* Defs.' Opp'n Pl.'s MSJ, Doc. No. 44 at 22–

---

[11]  The Stanislaus County Superior Court Judge presiding at plaintiff's preliminary hearing found that there was sufficient evidence to hold plaintiff over for trial only on the charge of violating California Penal Code § 422(a), which provides that "[a]ny person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the

25; *see also* Ex. A, Defs.' RJN, Doc. No. 42-6 (hearing transcript on motion to set aside

information).)  "The preclusive effect of a state court judgment in a subsequent federal lawsuit

generally is determined by the full faith and credit statute." *Marrese v. Am. Acad. of Orthopaedic*

*Surgeons*, 470 U.S. 373, 380 (1985).  By statute, a state's judicial proceedings "shall have the

same full faith and credit in every court within the United States . . . as they have by law or usage

in the courts of such State . . . from which they are taken."  28 U.S.C. § 1738.  This court must

look to the preclusion law of California in order to determine whether preclusion applies in this

case.

Issue preclusion prevents the relitigation of certain issues argued and decided in a

previous case.  *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 824 (2015).  To establish issue

preclusion, a party must show there was (1) a final adjudication (2) of an identical issue (3) that

was actually litigated and necessarily decided in the first suit and (4) that issue preclusion is being

asserted against "one who was a party in the first suit or one in privity with that party." *Id.* at

825; *see also Lucido v. Superior Ct. of Mendocino Cnty.*, 51 Cal. 3d 335, 341 (1990).  Generally,

a prior judicial determination at a preliminary hearing to hold a criminal defendant over for trial

has preclusive effect as to whether probable cause existed for the arrest.  *McCutchen v. City of*

*Montclair*, 73 Cal. App. 4th 1138, 1144–47 (1999); *see also Wige v. City of L.A.*, 713 F.3d 1183,

1185 (9th Cir. 2013) ("As a general rule, each of these requirements will be met when courts are

asked to give preclusive effect to preliminary hearing probable cause findings in subsequent civil

actions for false arrest and malicious prosecution.").  "When an individual has a full and fair

opportunity to challenge a probable cause determination during the course of the prior

proceedings, he may be barred from relitigating the issue in a subsequent § 1983 claim." *Awabdy*

/////

---

specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually
carrying it out, which, on its face and under the circumstances in which it is made, is so
unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a
gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that
person reasonably to be in sustained fear for his or her own safety or for his or her immediate
family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by
imprisonment in the state prison."

1    *v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004) (citing *Haupt v. Dillard*, 17 F.3d 285,

2    289 (9th Cir. 1994)).

3          There are two exceptions "to the general rule according preclusive effect to probable

4    cause findings." *Wige*, 713 F.3d at 1186.  First, "issue preclusion does not apply in false arrest

5    actions when additional evidence not available to the officers at the time of arrest is presented at

6    the preliminary hearing." *Wige*, 713 F.3d at 1186 (citing *McCutchen*, 73 Cal. App. 4th at 1146).

7    "Second, issue preclusion should be denied 'where the plaintiff alleges that the arresting officer

8    lied or fabricated evidence presented at the preliminary hearing.'" *Wige*, 713 F.3d at 1186

9    (quoting *McCutchen*, 73 Cal. App. 4th at 1147); *see also Awabdy*, 368 F.3d at 1068 ("[C]ollateral

10   estoppel does not apply when the decision to hold a defendant to answer was made on the basis of

11   fabricated evidence presented at the preliminary hearing or as the result of other wrongful

12   conduct by state or local officials.").

13         First, "the identity-of-issues requirement will generally be satisfied because in most cases

14   the issue resolved at the preliminary hearing is identical to the issue that must be resolved in a

15   false arrest or malicious prosecution action—namely, whether the evidence supports a finding of

16   probable cause." *Wige*, 713 F.3d at 1185.  "Thus, so long as the evidence known to the arresting

17   officers is not materially different from the evidence presented at the preliminary hearing, 'a

18   finding of sufficiency of the evidence to require the defendant to stand trial is a finding of

19   probable cause to arrest the defendant.'" *Id.* at 1185–86 (citing *McCutchen*, 73 Cal. App. 4th at

20   1146).  "If the evidence known to the arresting officers is materially different from the evidence

21   presented at the preliminary hearing, however, the identity-of-issues requirement will not be

22   met." *Id.* at 1186.

23         Here, plaintiff notes that Sergeant Carrillo's police report[12] states that, at the football

24   game, as defendant Tyler was walking past plaintiff onto the field, plaintiff "said something to"

25   defendant Tyler.  (Ex. D, Tyler Decl., Doc. No. 42-2 at 13.)  However, at plaintiff's preliminary

26   hearing in response to the district attorney's questions, defendant Tyler testified that, as he and

27

28   ───────────────

     [12]  As noted above, this police report was merely a regurgitation of what defendant Tyler told
     Sergeant Carrillo.

1    plaintiff were passing each other, defendant Tyler said, "What's up" to plaintiff.  (Ex. L,

2    Rosenfeld Decl., Doc. No. 43-10 at 6–7; *see also* Ex. A, Defs.' RJN, Doc. No. 42-6 at 9 (stating

3    that defendant Tyler "approached [plaintiff]; it was not the other way around.").)  Additionally,

4    Sergeant Carrillo's police report states that "[w]hile [defendant Tyler] was walking about *3 feet*

5    from [plaintiff] as he was going to enter the field, [plaintiff] followed Tyler to the entrance saying

6    something similar to, 'That's bullshit . . . You set me up and had me arrested . . . You're a punk

7    . . . I'm going to get you . . . I'll see you around.'"  (Ex. D, Tyler Decl., Doc. No. 42-2 at 13

8    (emphasis added).)  In contrast, when asked at the preliminary hearing how far plaintiff was from

9    him when plaintiff turned towards him and said, "You set me up," defendant Tyler responded,

10   "We were probably *ten yards* away from each other."  (Ex. L, Rosenfeld Decl., Doc. No. 43-10 at

11   7–8 (emphasis added).)  Such differences indicate that the evidence as known to Sergeant Carrillo

12   was significantly different with respect to its detail from the evidence presented at plaintiff's

13   preliminary hearing.  Even though the undisputed evidence on summary judgment presently

14   before the court now shows that defendant Tyler initiated contact with plaintiff, the probable

15   cause inquiry looks to what the arresting officers knew at the time of the arrest.  Accordingly, the

16   court does not find that the identity of issues requirement is met and thus, issue preclusion does

17   not apply.

18        Although the court finds issue preclusion inapplicable, plaintiff is still not entitled to

19   summary judgment in his favor with respect to his false arrest claim.  Generally, "[w]here the

20   facts or circumstances surrounding an individual's arrest are disputed, the existence of probable

21   cause is a question for the jury."  *Harper*, 533 F.3d at 1022.  The disputed facts in this case

22   primarily lie in the details of the confrontation between plaintiff and defendant Tyler at the

23   football game.  Significantly, the parties dispute the allegedly threatening words used by plaintiff.

24   (*Compare* Ex. M, Tyler Dep., Doc. No. 43-11 at 29 (stating that plaintiff told defendant Tyler,

25   "I'm going to get you.  I'm going to see you around."), *with* Ex. O, Cherry Dep., Doc. No. 43-13

26   at 19 (plaintiff denying that he said, "I'm going to get you.  I'm going to see you around," but

27   instead told defendant Tyler, "I'll catch you later."); *see also* Ex. Q, Miranda Dep., Doc. No. 45-

28   15 at 4 (stating that he did not see plaintiff make any physical or aggressive gestures or moves

1   toward defendant Tyler but did hear plaintiff say, "we can meet in the parking lot.").)  Because

2   there are genuine disputes of material fact as to the evidence underlying plaintiff's arrest,

3   plaintiff's motion for summary judgment in his favor as to his false arrest cause of action will also

4   be DENIED.

5               2.    Whether Defendants are Entitled to Qualified Immunity

6         In his motion for summary judgment, plaintiff asserts that, "to the extent defendants are

7   deemed private citizens who acted as state actors, qualified immunity is unavailable to them."

8   (Pl.'s MSJ, Doc. No. 43-1 at 22 (citing *Bracken v. Okura*, 869 F.3d 771, 776–78 (9th Cir. 2017)

9   (finding qualified immunity unavailable to an off-duty police officer working private hotel

10  security because there is "no firmly rooted tradition of immunity for off-duty or special duty

11  officers acting as private security guards")); *see also* Pl.'s Reply ISO MSJ, Doc. No. 47 at 11

12  ("[Plaintiff] argued that the defense of qualified immunity is not available to private citizens

13  engaged in joint state action.").)  Defendants' opposition does not address plaintiff's specific

14  contention on this issue and instead argues that, assuming defendants were engaged in state

15  action, defendants would be entitled to general qualified immunity.  (*See* Defs.' Opp'n Pl.'s MSJ,

16  Doc. No. 44 at 20–22.)  Plaintiff takes issue with defendants' qualified immunity argument given

17  that plaintiff only raised qualified immunity in a narrow context and defendants did not move for

18  summary judgment in their own motion on qualified immunity grounds.  (*See* Pl.'s Reply ISO

19  MSJ, Doc. No. 49 at 11.)

20        In any event, the court finds that defendants have not met their burden of demonstrating

21  that they are entitled to summary judgment on qualified immunity grounds.  "The doctrine of

22  qualified immunity shields officials from civil liability so long as their conduct does not violate

23  clearly established statutory or constitutional rights of which a reasonable person would have

24  known."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted) (quoting

25  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)); *see also Bruce v. Ylst*, 351 F.3d 1283, 1290 (9th

26  Cir. 2003).  When presented with a qualified immunity affirmative defense, the central questions

27  for the court are:  (1) whether the facts alleged, taken in the light most favorable to plaintiff,

28  demonstrate that the defendant's conduct violated a statutory or constitutional right; and

(2) whether the right at issue was "clearly established" at the time of the event in question. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *accord Pearson*, 555 U.S. at 236–42 (holding that courts need not analyze the two prongs of the analysis announced in *Saucier* in any particular order).

Here, defendants' qualified immunity argument is sparse and does not adequately explain whether the two requirements noted above are satisfied. (*See* Defs.' Opp'n Pl.'s MSJ, Doc. No. 44 at 22 ("Obviously, Tyler had the right to report Plaintiff's personal threats to the [OPD] and there is no case law holding otherwise.  Thus, even if Defendants were somehow mistaken as to the law or facts, they would still be entitled to qualified immunity."); *see also Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017) ("Qualified immunity is an affirmative defense that the government has the burden of pleading and proving.") (citing *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).)  To the extent defendants argue that the existence of probable cause for plaintiff's arrest supports qualified immunity (Defs.' Opp'n Pl.'s MSJ, Doc. No. 44 at 22), as previously discussed, issue preclusion does not apply to the probable cause determination in this action and there is a genuine dispute of material fact as to whether there was probable cause to arrest plaintiff (*see supra* Part B.1).  Therefore, the court finds that defendants are not entitled to summary judgment on qualified immunity grounds.  For the same reasons, the court also concludes that making a determination on summary judgment that defendants are not entitled to qualified immunity would be premature.  *See Shannon v. Cnty. of Sacramento*, No. 2:15-CV-00967 KJM DB, 2018 WL 3861604, at *8 (E.D. Cal. Aug. 14, 2018) ("Because [the officer's] entitlement to qualified immunity depends on disputed facts that must be resolved by a jury, granting summary judgment on this question would be premature.").

## CONCLUSION

For the reasons explained above:

1.  Defendants' motion for summary judgment (Doc. No. 42) is GRANTED as to plaintiff's fifth cause of action for conspiracy under § 1983 and all claims against defendant Seese.  In all other respects, defendants' motion is DENIED;

/////

2.  Plaintiff's motion for summary judgment (Doc. No. 43) is DENIED; and

3.  The Clerk of the Court is directed to now reassign this case to U.S. District Judge Jennifer L. Thurston and to remove the "NONE" designation.

IT IS SO ORDERED.

Dated:   __**February 23, 2022**__                    _____
                                         UNITED STATES DISTRICT JUDGE